**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

FILED
Scott L. Poff, Clerk
United States District Court

By staylor at 4:54 pm, Apr 26, 2019

UNITED STATES OF AMERICA,

      v.

STEPHEN MICHAEL KELLY; MARK
PETER COLVILLE; CLARE THERESE
GRADY; MARTHA HENNESSY;
ELIZABETH MCALISTER; PATRICK M.
O'NEILL; and CARMEN TROTTA,

      Defendants.

CASE NO.: 2:18-cr-22

## ORDER AND MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Defendants have filed individual, but largely identical, motions to dismiss the charges

against them.  Docs. 87, 102, 118, 122, 141, 158, 171.  For the reasons set forth below, I

**RECOMMEND** the Court **DENY** Defendants' Motions to Dismiss.

### INTRODUCTION

Late on the night of April 4, 2018, seven Catholics—Defendants in this action—equipped

with bolt-cutters, spray-paint, and a hammer made of melted-down guns, cut a padlock, opened a

gate, and stepped onto the property of the Naval Submarine Base Kings Bay in Kingsland,

Georgia.  Once inside the main perimeter fence, three of the seven Defendants walked toward

another enclosed area.  When the three arrived, they cut through the secondary fence and

concertina wire and entered the "Limited Area," a highly secured area where the Naval Security

Force is prepared to use deadly force against intruders.  The other four Defendants, while on the

base, poured blood on the ground, hammered on the sides of a monument, hung banners and

painted messages protesting nuclear weapons, and joined together in prayer.  Base security personnel located and arrested all seven Defendants.

Defendants are members of the Plowshares Movement, a Christian protest and activism group opposed to nuclear weaponry.  Defendants include four grandparents, one Jesuit priest, and a descendent of Dorothy Day, a co-founder of the Catholic Worker movement who is currently under consideration by the Catholic Church for canonization as a saint.  Doc. 313 at 23, 125, 145; Doc. 316 at 24–25, 124, 151.  Defendants entered the base that night intending to perform, in their words, "nonviolent acts of prophetic witness against the government's possession of nuclear weapons . . . ."  Doc. 245 at 5.

Each Defendant has been charged in this case with three felonies and one misdemeanor.  Defendants move to dismiss the charges against them on following grounds: (1) unlawful prosecution under the Religious Freedom Restoration Act ("RFRA"); (2) selective and vindictive prosecution; (3) duplicitous and multiplicitous counts; and (4) failure to state an offense under international and domestic law.  For the reasons set forth below, I **RECOMMEND** that the Court **DENY** Defendants' Motions to Dismiss on all four grounds.

## BACKGROUND

### I.    Naval Submarine Base Kings Bay

Located on almost 17,000 acres of land surrounded by 26 miles of perimeter fencing, Naval Submarine Base Kings Bay and the activities it supports are part of the sea-based component of the Department of Defense's strategic deterrence triad.  Doc. 316 at 218–19.  The base contains the Strategic Weapons Facility, Atlantic ("SWFLANT"), the only strategic weapons facility on the Eastern Seaboard.  Id. at 215–18.  SWFLANT is responsible for the Trident II D5 missile system.  Id.  Kings Bay is also home port to eight Ohio-class submarines

(including six fleet ballistic missile submarines and two guided missile submarines).  Id. at 215–17.  The ballistic missile submarine force "provides the United States with its most survivable nuclear strike capability" and is vital to "deterring a surprise nuclear attack on the United States of America . . . ."  Doc. 227-1 at 3.

Kings Bay employs extensive security measures, including a hardened fence line around nearly the entire base, though the full scope and details of the security measures are classified. Doc. 316 at 222, 250–53.  There are three marked gates—the Franklin Gate, the Stimson Gate, and the Madison Gate—by which every person coming on or off Kings Bay must enter.  Id. at 224.  The area behind the fence is not open to the public, and armed guards stand at the gates to ensure all those who enter have proper credentials.  Id. at 222.

The Naval Security Force that is charged with protecting the base considers all unauthorized entry on base as an indication of hostile intent which, along with opportunity and capability, is one part of a three-part assessment used in determining whether to employ deadly force.  Id. at 224–25.  Due to the nature of the assets at Kings Bay, the Naval Security Force is authorized to use deadly force against all intruders.  Id. at 224–26, 228, 245.  Warnings to this effect are posted "on various locations for fencing around critical infrastructure."  Id. at 225.

Once inside the perimeter fence, many areas of the base are accessible.  This includes the SWFLANT engineering services building and the "static missile display" to the front of the building.  Doc. 57 at 10–12.  The static missile display (referred to by Defendants as the "missile shrine") showcases five or six decommissioned ballistic missiles which surround a brick entrance sign.  Doc. 313 at 190–92, 198; Doc. 28-2; Doc. 28-3; Doc. 28-6.  The SWFLANT insignia is displayed on the sign, and illuminated lettering spells out "Strategic Weapons Facility Atlantic." Doc. 313 at 190–92, 198; Doc. 28-2; Doc. 28-6; Doc. 245-1 at 4–5.

More sensitive areas, however, are protected by additional barriers and security protocols. Doc. 313 at 116–118; 197; Doc. 316 at 154–56. One of these is referred to as the "Limited Area."[1] Doc. 57 at 10–11; Doc. 316 at 226. The Limited Area is set off from other areas of the base by double lines of fencing and concertina wire. Doc. 57 at 11, 15–17; Doc. 316 at 154. Written warnings posted on the fencing surrounding the Limited Area advise that deadly force may be used against unauthorized intruders, and a broadcast system plays a recurring announcement to this effect every eight to nine minutes. Doc. 316 at 225.

## II.     Events of April 4–5, 2018[2]

Defendants entered Kings Bay on April 4, 2018 after months of praying and planning. Doc. 313 at 50, 62–63; Doc. 316 at 149–51, 175–77. Once inside, the seven split into three groups. Doc. 57 at 10; Doc. 245-4 at 9. Two—Patrick O'Neill and Mark Colville—went to the static missile display and left painted messages, poured blood, took down the letters on a sign, and hit concrete statues of missiles with a hammer.[3] Doc. 28-2 to 28-6; Doc. 245-1 at 4; Doc. 245-6 at 2; Doc. 313 at 76–77, 90–92, 161–62; Doc. 316 at 111. Two others—Clare Grady and Martha Hennessy—walked to the SWFLANT engineering services building. Doc. 316 at 194–95. There, Grady and Hennessy spray-painted messages on the sidewalk and poured blood on the ground outside of the building before joining Defendants O'Neill and Colville at the static missile display. Doc. 28-7; Doc. 28-8; Doc. 57 at 15; Doc. 245-3 at 4–5; Doc. 313 at 33–37;

---

[1]     Defendants refer to this area as the "bunkers." Doc. 316 at 139, 154.

[2]     Defendants entered the base during the evening of April 4, 2018 and were arrested in the early hours of April 5, 2018. Doc. 57 at 8, 29, 34; Doc. 190 at 2; Doc. 313 at 48–49, 92, 107, 137, 178–79; Doc. 316 at 158, 193, 282.

[3]     The spray-painted messages include: "Abolish nukes now;" "Swords into Plowshares;" "Idol;" "Blasphemy;" "Turn away from sin;" and "May love disarm us all." Docs. 28-1 to 28-7.

Doc. 316 at 186–88, 194–96.  Grady and Hennessy left behind a banner, an "indictment" charging "the Kings Bay Naval Submarine Base and all government officials, agencies, and contractors" with "perpetuating . . . war crimes[,]" and a copy of *The Doomsday Machine: Confessions of a Nuclear War Planner* by Daniel Ellsberg.  Doc. 245-3 at 4–5; Doc. 305-3 at 2; Doc. 313 at 33–37, 85.  The remaining three—Elizabeth McAlister, Carmen Trotta, and Father Stephen Michael Kelly—cut through a fence and concertina wire and entered the Limited Area. Doc. 245-5 at 8–9; Doc. 245-7 at 9–10; Doc. 313 at 116–19; Doc. 316 at 153–55; 224–28.  Once inside the Limited Area, the three unfurled their banners and prayed.[4]  Id. at 158; Doc. 57 at 28– 29.

All seven Defendants were arrested by the base security inside the perimeter fence at the base.  Doc. 57 at 10, 14–17; Doc. 313 at 178–79.  The Government recovered, among other things, a GoPro camera that Defendants used to record parts of their actions that evening.  Doc. 57 at 10, 17, 36; Doc. 313 at 191.  The Government charged each Defendant with four counts: (1) conspiracy, in violation of 18 U.S.C. § 371; (2) destruction of property on a naval installation under 18 U.S.C. § 1363; (3) depredation of government property in violation of 18 U.S.C. § 1361; and (4) trespass under 18 U.S.C. § 1382.

III.   **Defendants' Beliefs**

Defendants argue the Government's continued possession, maintenance, and development of Trident missiles is a war crime which threatens the continued existence of everyone on the planet.  See Doc. 88 at 3 ("Kings Bay is home to 8 ballistic missile submarines

---

[4]     The group carried three banners with them onto the base.  Doc. 313 at 35–36.  These banners read: "The Ultimate Logic of the Trident is Omnicide–Plowshares Now;" "The ultimate logic of racism is genocide–Dr. Martin Luther King;" and "Nuclear weapons: illegal/immoral."  Id.; Doc. 57 at 28–29; Doc. 88 at 8; Doc. 245-3 at 5; Doc. 305-1 at 2.

and guided missile submarines of the U.S. Navy Atlantic Fleet with the destructive power to destroy millions of members of the human race and to inflict catastrophic damage to life for every person on earth."); Doc. 221 at 27.  Defendants believe these are not second strike but "first strike" weapons, and their use would be an act of "omnicide."  Doc. 245-3 at 4–5; Doc. 245-4 at 2; Doc. 245-6 at 3; Doc. 313 at 27, 31, 35–36, 151.  The seven believe that nuclear weapons are incompatible with a religion that teaches "thou shall not kill."  Doc. 221 at 27–28.  Rather than trust in God for safety and security, Defendants believe the United States has placed its faith in nuclear weapons.  Doc. 221 at 16–18, 56–58; Doc. 313 at 75, 106; Doc. 316 at 42, 127–30, 164–66, 170, 177.  According to Defendants, "[T]here is no difference between [the Kings Bay] base and a concentration camp."  Doc. 316 at 27.

Defendants contend they entered the naval base to discharge themselves of what they viewed as complicity through inaction, to "preach the gospel of nonviolence directly to Navy and Marine personnel caught up in the contagion of sin[,]" and to protest, as they believe their religion dictates, the threat to humanity posed by the nuclear warheads they believe are located on the base.[5]  Doc. 245-4 at 1; Doc. 313 at 35–37, 109–12; 131–32; Doc. 316 at 125–29; 138–39.  Defendants came to answer, as they understood it, the call in Isaiah 2:4 "to beat . . . swords into

---

[5]      During the evidentiary hearing, Captain Brian Lepine could "neither confirm publicly nor deny the presence of nuclear weapons onboard Naval Submarine Base Kings Bay or any of the Trident submarines that are homeported there."  Doc. 316 at 254.  Regardless, insofar as Defendants believed the naval base sheltered nuclear weapons and, thus, felt religiously compelled to act based on that belief, the actual nature of the weapons themselves is largely immaterial to the legal analysis regarding their prima facie RFRA defense.  See New Doe Child #1 v. United States, 901 F.3d 1015, 1026 n.12 (8th Cir. 2018) ("[I]n the RFRA analysis, we credit what the Plaintiffs believe to be true.").

plowshares and their spears into pruning hooks."[6]  Doc. 215 at 2; Doc. 313 at 29–30, 104, 110; Doc. 316 at 45, 105, 132–33, 175.

All seven Defendants are part of the Plowshares Movement, a Christian activist group opposed to nuclear weaponry which began around 1980.  Doc. 88 at 7; Doc. 215 at 2; Doc. 245-1 at 1; Doc. 245-2 at 3, 7–12; Doc. 245-3 at 4; Doc. 245-4 at 3, 8; Doc. 245-6 at 2; Doc. 313 at 29–30; Doc. 313 at 29–30, 104, 110–12; Doc. 316 at 45, 105, 132–33, 175, 186.  Defendants' actions on April 2018 are a continuation of the Plowshares practice of "symbolic disarmament" and are similar to other actions taken by different groups of Plowshares activists since the movement's inception.  See, e.g., United States v. Sicken, 223 F.3d 1169, 1170 (10th Cir. 2000) ("[A]nti-nuclear protesters and members of an organization called the Plowshares Movement . . . broke into an unmanned nuclear missile facility . . . to perform an anti-nuclear protest by 'disarming nonviolently and symbolically.'"); United States v. Kabat (Kabat I), 797 F.2d 580, 597 (8th Cir. 1986) (Bright, J., dissenting) (discussing a Plowshares defendant who "referred to his 'act of disarmament' as a 'symbolic act'" and "a 'witness against nuclear weapons'"); United States v. Brodhead, 714 F. Supp. 593, 597–98 (D. Mass. 1989) (observing that the purpose of the "Transfiguration Plowshares," a group of protestors who entered South Weymouth Naval Air Station, was to "celebrate the transfiguration of Christ" and to "symbolically disarm[] carriers of nuclear first strike weapons").

Like other Plowshares activists, Defendants refer to their April 2018 actions as "non-violent symbolic disarmament."  Doc. 88 at 8; Doc. 316 at 181–86.  Defendants view the

---

[6]    Isaiah 2:4 states in full: "He will judge between the nations and will settle disputes for many peoples.  They will beat their swords into plowshares and their spears into pruning hooks.  Nation will not take up sword against nation, nor will they train for war anymore."  *Isaiah* 2:4 (New International Version).

Isaiahan reference to beating swords into plowshares as a call to action to fulfill the prophecy, transform weapons of war, and bring peace. See, e.g., Doc. 313 at 29–30 (stating that "the Plowshares movement very much relies on [Isaiah's] instruction, that we are to beat our swords into plough shares [sic] and our spears into pruning hooks" and "turn the sword into an implement of life-giving activity" (*testimony of Martha Hennessy*)); Doc. 316 at 133 (describing Isaiah 2:4 as "something that has to be embodied" and "a prophetic witness of conversion" (*testimony of Father Stephen Kelly*)). Defendants argue acts of symbolic disarmament are a literal embodiment of the call from Isaiah capable of drawing the world away from "idolatrous" reliance on nuclear weapons for safety and security and bringing it back to God. Doc. 245-3 at 7; Doc. 316 at 175.

## IV.   Procedural History

Each Defendant filed a Motion to Dismiss under Rule 12(b) of the Federal Rules of Criminal Procedure, though all seven motions (and supporting briefs) are substantively identical. Docs. 87, 102, 118, 122, 141, 158, 171. In their Motions, Defendants raise the following arguments for dismissal: (1) selective prosecution; (2) duplicitous and multiplicitous counts; (3) failure to state an offense under international and domestic law; and (4) unlawful prosecution under RFRA. Docs. 87, 102, 118, 122, 141, 158, 171; see Docs. 88, 89, 113, 120, 123, 141-1, 158-1, 171-1; see also 42 U.S.C. §§ 2000bb to 2000bb-4. Defendants claim they are immune to prosecution under RFRA because their actions were religiously motivated.

After an August 2, 2018 motions hearing, the Court deferred ruling on all arguments for dismissal and ordered supplemental briefing on the RFRA defense. Doc. 220 at 4–5. Along with their supplemental briefs, each Defendant submitted an individual affidavit about his or her

religious beliefs and experiences as a Catholic. Docs. 245-1 to 245-7.[7]  In addition, Defendants

requested an evidentiary hearing on the RFRA defense, docs. 246, 249, 252, 255, 256, 258, 260,

which the Court granted, doc. 272.  After the hearing, the Court approved a request for additional

briefing, doc. 294, to allow the Government and individual Defendants to further their arguments

in light of the evidence presented at the hearing.  Docs. 335, 336, 337, 338, 339, 340, 341, 342.

The Court also granted a motion to allow several religious liberty professors to file an amicus

brief.  Docs. 285, 286, 298.  The Court has reviewed and considered the amicus brief.

## V.     Evidentiary Hearing

The evidentiary hearing requested by Defendants took place on November 7, 2018 and

November 19, 2018.[8]  Docs. 313, 316.  Captain Brian M. Lepine, the base commander of Kings

Bay, and Scott Bassett, the Kings Bay public affairs officer, testified for the Government.  The

---

[7]      Defendants filed their affidavits and supplemental briefs individually.  Docs. 245, 248, 253, 254, 257, 259, 261.  For ease of reference, the Court will cite to the attachments to Elizabeth McAlister's supplemental brief, doc. 245, because McAlister attached copies of the affidavits from all seven Defendants.

[8]      The record before the Court also contains evidence submitted before the November 2018 hearing. During the Defendants' detention hearings, the Government provided the testimony of Special Agent Barry Clinedinst and submitted nine exhibits, which included pictures of the damage Defendants allegedly caused.  Docs. 28, 57.  The Government also submitted an affidavit from Captain Lepine with its supplemental brief.  Docs. 227, 227-1.  Several of the Defendants spoke to their religious motivations during their May 17, 2018 detention hearings.  Docs. 34, 57, 199.  Additionally, Defendants submitted five attachments in support of their Motions to Dismiss: (1) an affidavit and resume from Professor Francis A. Boyle, which was later supplemented, docs. 279, 293; (2) an affidavit from Captain Thomas Rogers; (3) an affidavit from Bishop Thomas Gumbleton; (4) an affidavit from Jeffrey Carter; and (5) the March 27, 2017 Memorandum from the Department of Defense on the Faith and Belief Codes for Reporting Personnel Date of Service Members.  Docs. 89-1 to 89-5; Doc. 113-1 at 1–32; Docs. 120-2 to 120-6; Docs. 123-1 to 123-5; Doc. 141-2 at 1–32; Docs. 158-2 to 158-5; Docs. 171-2 to 171-7.  Though Defendant Hennessy did not attach a copy of Francis Boyle's affidavit to her Motion, she adopted and incorporated her Codefendants' motions and attachments at the evidentiary hearing.  Doc. 313 at 172–74; see Doc. 158-1 to 158-5.  All Defendants submitted with their first supplemental briefs personal affidavits evincing their individual religious beliefs and motivations.  See, e.g., Docs. 245-1 to 245-7.  Additionally, Defendant Grady included with her affidavit four pages of documents describing her participation in two previous Plowshare actions in 1983 ("the Griffiss Plowshares") and in 2003.  Doc. 245-2 at 13–16; United States v. Allen, 760 F.2d 447 (2d Cir. 1985).

Government tendered a copy of each Defendant's criminal history from the National Crime Information Center ("NCIC") as Government Exhibit 1.[9]  Doc. 306; Doc. 313 at 174.

For their part, Defendants offered the testimony of nine witnesses—the seven Defendants and two expert witnesses.[10]  Professor Jeannine Hill Fletcher, a theologian at Fordham University, testified as an expert in "modern Catholic theology and Catholic social action with particular attention to how religious communities use symbolism to address social issues."  Doc. 316 at 32–33.  Defendants' second expert witness, Bishop Joseph R. Kopacz, bishop of the diocese of Jackson, Mississippi, testified as an expert "in Catholic faith and Catholic social action."  Id. at 103.

The following subsections describe the relevant testimony and evidence from the evidentiary hearing.  Because RFRA requires an analysis of the Government's actions in light of Defendants' individualized religious beliefs, when discussing Defendants' testimony, the Court

---

[9]    The Government concedes the NCIC records submitted are "in various degrees of completion." Doc. 313 at 90.  In discussing the Defendants' criminal histories, the Court is bound by the record before it, which includes the NCIC records submitted by the Government and the Defendants' own testimonies and stipulations.  Notably, all Defendants stipulated to the admission of these criminal history records, and, during their testimonies, Defendants agreed that their criminal history includes many protest-related arrests, prosecutions, and, occasionally, convictions.  Doc. 313 at 47, 87–88, 119–21, 126–27, 174, 176–77; Doc. 316 at 159, 197; see also Doc. 313 at 145 ("I want to stipulate to the fact that I have a long, ongoing criminal history. . . . I will stipulate that it's all true, and indeed, I've been arrested seven times at the Pentagon alone." (testimony of Patrick O'Neill)).  However, the Court is aware that additional information may exist that contradicts, supplements, or qualifies the criminal history information on record.  See, e.g., Docs. 352, 353.  Thus, any discussions of Defendants' criminal histories found within this Report and Recommendation are made only for purposes of ruling on Defendants' Motions to Dismiss and are expressly limited to this purpose.

[10]    During the evidentiary hearing, each Defendant explicitly adopted the testimony of Professor Hill Fletcher and Bishop Kopacz, the affidavits of their Codefendants, and the testimony of their Codefendants from both the evidentiary hearing and from the bond hearings.  Doc. 313 at 172.  Defendants submitted Hill Fletcher's CV as Defense Exhibit 1.  Doc. 316 at 63.  Additionally, Defendant Hennessy independently submitted three exhibits during her testimony.  Doc. 305; Doc. 316 at 35–37.  After the hearing, Defendant McAlister attached to her supplemental brief a copy of an argument she made to the court regarding "freedom of religion and the idolatry of nuclear weapons" during her 1984 prosecution for her participation in the Griffiss Plowshares action.  Docs. 337, 337-1; see also Allen, 760 F.2d at 448–49.

will analyze the evidence and testimony as applied to each Defendant and make factual findings as to the scope of each Defendant's religious belief.

### A.      The Government Witnesses

Captain Lepine testified about the importance of the strategic assets located at Kings Bay and how those weapons fit into the national security objectives of the Department of Defense and the United States Government.  Doc. 316 at 219.  The "ballistic missile nuclear submarine force" provides "assurance of a possible second strike should an adversary launch attack against the United States of America."  Id.; Doc. 227-1 at 3.  "That guaranteed second strike . . . essentially assures that our adversaries would not execute a first strike."  Doc. 316 at 219.

Captain Lepine stressed the importance of the security protocols to protect docked submarines and the need to prevent unauthorized access to them, as the ballistic and guided missiles onboard are vital assets to national security.  Id. at 221.  He also testified about the real-world threats against the Ohio-class submarines.  Doc. 227-1 at 3 ("The threat to these strategic assets by the enemies of our nation cannot be overstated.").  He described the attack on the USS *Cole* on October 12, 2000 as one "notorious example."  Id.; Doc. 316 at 221.  A "suicide bomber on a small service craft" attacked the USS *Cole* while the ship was in port in Aden, Yemen, causing 17 deaths and wounding many more.  Doc. 227-1 at 3; Doc. 316 at 221.  After the attack, the United States Navy and other services focused on the importance of protecting ships in port.  Doc. 227-1 at 3–4; Doc. 316 at 221.  Though "undetectable" when deployed and submerged, when surfaced in port, the Ohio-class submarine is at its most vulnerable.  Doc. 227-1 at 3–4 ("Protecting a submarine [at port] requires an elaborate combination of personnel, technology, communications, and concepts of operation."); Doc. 316 at 219–22.  Thus, an Ohio-class submarine, like all submarines, is most likely to be attacked "in or near a port."  Doc. 227-1 at 4.

Captain Lepine explained how preventing unauthorized access to Kings Bay relates to the United States' overall interest in national security.  "Given the sensitivity of Naval Submarine Base Kings Bay, nothing can be allowed to interfere with strict security measures."  Id. at 5.  Unauthorized intruders "endanger the safety of base personnel, the security of the vital facilities and assets on base, and even their own safety."  Doc. 227-1 at 6.  Intruders disrupt "normal day-to-day operations" and "put[] the entire security contingent . . . on alert[.]"  Doc. 316 at 227–28.  Such disruptions "impact operations that are directly in support of our nation's strategic deterrence programs, timelines, policies, and procedures."  Id.

If an intruder is discovered on Kings Bay, Captain Lepine "turn[s] them over to the Camden County Sheriff" for arrest and charges in accordance with a standing agreement affording Camden County concurrent jurisdiction over crimes committed on the base.  Id. at 229–30.  Captain Lepine testified he believes it is necessary to prosecute individuals who enter the base without authorization, and not doing so "places members of [his] security forces at risk" by encouraging similar behavior from others.  Id. at 230.  While he does not have any authority to make decisions about the consequences of such unauthorized entry after turning over intruders, he testified he believes civil sanctions, ban and bar letters, or alternatives to criminal prosecution, such as civil sanctions, would be insufficient.  Id. at 230, 245–47.

Scott Bassett, public affairs officer for Naval Submarine Base Kings Bay, also testified for the Government.  In the early hours of April 5, 2018, Bassett received a call about seven intruders on the base.  Doc. 313 at 178–79.  Later that morning, he spoke with a reporter from The Washington Post and stated that "there was no apparent threat to personnel, to any military artifact or military submarine."  Id.  He intended his statement to "communicate to the U.S. public that the security of Naval Submarine Base Kings Bay was still intact."  Id.  While he made

12

this statement when the investigation was still ongoing, he still believes it to be true.  Id. at 178–79, 190.

Basset has worked as the public affairs officer at Kings Bay for eight years.  Id. at 181–82.  During his employment, demonstrations at the base have been "common."  Id.  These demonstrations mainly "occur on public property off the installation," but Captain Lepine, with advice from Bassett, has authority to approve on-base demonstrations.  Id. at 181–85, 189.  Bassett describes his relationship with community groups seeking to protest on the base as "cordial and professional."  Id. at 185.  In deciding whether to grant approval, Bassett does not distinguish between anti-nuclear and pro-nuclear weapons groups, nor does he give different treatment to groups seeking to protest for religious, as opposed to purely political, purposes.  Id. at 187.  He is familiar with two anti-nuclear-weapons groups who protest regularly at the base: the Florida Coalition for Peace and Justice and the Pax Christi group.  Id. at 182–83.

Both Captain Lepine and Basset discussed Pax Christi, a religious organization that protests twice a year at the Bancroft Memorial.  The Bancroft Memorial is a "real sized submarine display" which showcases the actual sail of the decommissioned ballistic missile submarine USS *George Bancroft*.  Doc. 313 at 184; Doc. 316 at 233.  The sail is "mounted" on the ground to "look[] like a submarine breaching the water."  Doc. 313 at 184; Doc. 316 at 233.  While the Bancroft Memorial sits outside of the perimeter fencing and is "accessible to the public," it is located on federal property and is part of Naval Submarine Base Kings Bay.  Doc. 313 at 184; Doc. 316 at 233.  The Pax Christi group, a Catholic peace organization, regularly holds a candlelight vigil on the base on New Year's Eve, and the group routinely contacts

13

Bassett to ask permission to hold the vigil at the Bancroft Memorial.[11]  Doc. 313 at 183–84; Doc. 316 at 234.  Bassett, with Lepine's approval, also has authority to approve requests to protest behind the perimeter fence and could, for example, approve a request to protest at the static missile display.  Doc. 313 at 189–90.  Neither Basset nor Captain Lepine received a request to permit any type of religious or political activity on the base from Defendants.  Doc. 313 at 181, 186; Doc. 316 at 234.  Indeed, as described below, Defendants testified they did not make any requests, as they believed such a request would be denied.

    **B.**    **Defense Witnesses**

        *1.*    *Expert Witnesses*

Both Professor Jeannine Hill Fletcher and Bishop Joseph R. Kopacz discussed the scriptural and doctrinal bases for Defendants' beliefs and how those beliefs relate to their April 2018 actions.  Doc. 316 at 34–97, 105–22.  Hill Fletcher explained Catholic social action is a doctrine "rooted in prior articulations going all the way back to scripture" which addresses "how the Church is supposed to engage in the modern world."  Id. at 36.  Both experts testified that "the actions of the Defendants are in accordance with Catholic social teaching on the primacy of conscience."  Id. at 34, 109.  Primacy of conscience is the idea that "God has written a moral law on human hearts" and, thus, "conscience binds us to those human laws which are in accordance with the moral law, or the law of God written on our hearts, and that conscience is not binding on those laws that are determined to be unjust laws."  Id. at 34–35.

According to Professor Hill Fletcher, under Catholic social teachings, nuclear weapons are "contrary to that fundamental orientation of loving God and loving neighbor."  Id. at 37.  She

---

[11]    Though the Bancroft Memorial is on base property, the public does not need to request permission to visit it.  Doc. 313 at 187.  The Memorial is in front of the perimeter fencing and open to the public.  Id.

explained that "in Catholic social perspective, any law that protects nuclear armament is not in the common good." Id. at 82.  As Catholics are called "to defend and take care of God's creation, then Trident can be seen as an idol . . . that's put in the place of God." Id. at 42. According to these experts, Catholic social teachings require Catholics to answer for their "complicity in unjust laws or unjust social situations." Id. at 60, 105–07.  Hill Fletcher stated, "There's a sense in Catholic teaching that it's not just what we do but what we don't do that we're responsible for." Id. at 60.  She testified that Defendants' April 2018 actions were "compelled by a deep spiritual, internal understanding of what one's conscience is bound to do" in accordance with their beliefs about the immorality of nuclear weapons.  Doc. 316 at 92. Bishop Kopacz agreed that engaging in symbolic nuclear disarmament to bring attention to the possible consequences of nuclear weaponry is "certainly within . . . our tradition of faith." Id. at 106, 109.

Professor Hill Fletcher and Bishop Kopacz provided multiple examples of Catholic doctrinal support for both Defendants' actions and their condemnation of nuclear weapons.   In the early 1980s, the Conference of Catholic Bishops (of which Bishop Kopacz is a member) approved of the short-term possession of nuclear weapons. Id. at 115–16.  However, the Catholic Church has since "developed and evolved to say that there's no acceptance for these weapons that no one can control once they're unleashed." Id. at 113, 117.  Both experts discussed Pope Francis's 2017 statement in which he condemned the very possession of nuclear weapons. Id. at 38, 112–13.  Bishop Kopacz agreed that Pope Francis's recent statement indicates that "time is up." Id. at 115–18.  However, the proliferation and development of nuclear weapons "continues to expand and accelerate." Id.  Bishop Kopacz explained that "[w]ords are not going to stop it," but "action at least has a chance of stepping in the breach and making a difference,

again, not terroristic actions, but actions that do no harm to people but yet make a powerful statement, as has been done here."  Id.  He stated, "That that kind of breaking of the law, again, nonviolent resistance to what is perceived as evil, to what is believed to be evil, is . . . very justified."  Id. at 108–09.

Professor Hill Fletcher testified that Defendants, having determined the possession of nuclear weapons is antithetical to God's law, believed they would face significant religious costs if they did not engage in symbolic disarmament.  While the practical repercussions of inaction are "quite low," she explained that "in the broad theological frame, one would imagine that there would be some sort of judgment . . . on those who did not transform an unjust status quo."  Id. at 61.

### 2.    *Prophetic and Sacramental Action*

According to the two experts, Defendants' April 2018 actions are best understood as both prophetic and sacramental.  Id. at 41–47, 108, 111–13.

*Prophetic Action.*  According to defense experts, prophetic action, as a broad classification, is action "designed to call a community and nation back to justice and righteousness."  Id. at 93.  Prophetic acts apply religious doctrines to modern conflicts and involve public action that makes God's presence known to the world.  Id. at 46.  Prophetic acts intend to "call out the nations in the ways in which their laws are unjust, and their actions are unrighteous."  Id. at 45.  The prophetic actor's role is "to read the signs of the times and to call the community and the nation back to justice and righteousness."  Id. at 54.  "In the history of the Catholic and the Christian tradition, the prophetic role is one that often necessarily violates unjust laws in order to see those laws transformed."  Doc. 316 at 53.

16

  ***Sacramental Action.*** Both experts testified that Defendants believe that Kings Bay has been desecrated by the presence of nuclear weapons and that Defendants engaged in sacramental action to re-consecrate that land, consistent with Catholic theological principles.  While symbolic disarmament is not one of the seven "enumerated" sacraments recognized by the Catholic Church, it is consistent with the "Catholic sacramental imagination" which extends sacramental power to actions which use physical acts and objects as vehicles for spiritually transforming material spaces and realities.[12]  Id. at 42, 66, 87–88, 95–96.  Sacramental actions use earthly symbols to "make the presence of God's grace a reality in the world."  Id. at 41.  By manifesting divine power through earthly elements, "sacramental action reconsecrates" and "mak[es] holy what had been desecrated."[13]  Id. at 41, 87, 96.

  Professor Hill Fletcher testified that the sacramental nature of Defendants' April 2018 actions makes the Kings Bay location central to Defendants' religious exercise.  Unlike symbolic or prophetic actions, sacramental actions "can't be performed anywhere."  Id. at 67–68.  Rather, location is important; outside of "extraordinary circumstances," the sacrament is "usually performed in the scared site," as "the reality of what's in front of us [is] part of the sacramental

---

[12]  Hill Fletcher explained that Defendants followed "a pattern that is outlined within Catholic canon law" and "appl[ied] it in a new location."  Id. at 65.  For example, the Code of Canon Law "has a penitential rite" for repairing sacred space when that space is "violated by gravely injurious actions done in them."  Id. at 65.  While no canonical sources describe the "sacramental action of nuclear disarmament," Hill Fletcher views "the pattern that the defendants enacted" as part of a broader pattern of Catholic sacramental imagination and "Catholic sensibility in terms of making places sacred."  Id. at 65.

[13]  As sacraments draw on earthly symbols, actions can be both sacramental and symbolic, though not all symbolic action can be sacramental.  Id.  A purely symbolic act merely "point[s] toward something else."  Id. at 94.  In contrast, sacramental actions are "not just a symbol of Christ's grace but actually mak[e] it a reality in the world."  Id.  Similarly, sacramental and prophetic action are not mutually exclusive categories.  Rather, actions which "make[] present Christ's grace in a situation of injustice" and also "denounce injustice and bring[] about justice and righteousness" can have both prophetic and symbolic dimensions.  Id. at 96–97.

moment."[14]  Id. at 67–69, 89–90, 94, 96.  Hill Fletcher testified that "the location is very

important here in terms of a sacramental action [and] prophetic call to transform that particular

reality of idolatry and to reclaim that particular location as part of God's creation and to

transform that reality."  Id. at 81.  While "the witnessing of the idolatry of Trident [missiles] . . .

could be done symbolically in lots of different venues," to "really . . . connect with the site of the

desecrated location," the sacramental act "has to be performed [at] that location."  Id. at 68.  She

explained, "[T]he material reality of the Trident nuclear warhead had made a space unholy, and

so . . . standing at a distance just doesn't perform the same sort of action."  Id. at 89–90.

    According to Hill Fletcher, Defendants, recognizing the Trident nuclear warhead "as an

idol, something that is put in the place of God," engaged in symbolic denuclearization to

"attempt[] to reveal our own idolatry in protecting that warhead."  Id. at 41–42.  Hill Fletcher

stated, "[T]his particular sacramental action was also directed at what the prophet does in terms

of waking up the rest of society to the injustice that has become the status quo."  Id. at 72, 112–

13.  In doing so, Defendants engaged in different symbolic actions which, because of their

purpose and the location where the actions were performed, also constituted a sacrament.  Id. at

41–42, 66, 72, 89–90.

    Bishop Kopacz described Defendants as a "spiritual special op team," comparing their

April 2018 actions to other "prophetic action[s] that often violated the laws of Jim Crow" during

the Civil Rights Movement.  Id. at 106.  According to defense experts, Defendants "read the

signs of the times [and saw] nuclear weapons as a force of destruction that's contrary to the law

---

[14]     Hill Fletcher explained that, similarly, most of the seven "enumerated" sacraments must be
performed in a church.  Id. at 67–69, 92–96.  Under extraordinary circumstances, sacraments may be
performed outside of the religious space—for example, a dying soldier could receive last rites on the
battlefield, or a sick child could be baptized in a hospital before death.  Id.  Otherwise, "the sacraments
are usually performed in the scared site" in front of the community of "those gathered in the church."  Id.

of God." Id. at 46.  Defendants "see this nuclear weapon as if it's the golden calf," the Bishop

explained, "so . . . again, the action to symbolically disarm that is a powerful message."  Id. at

111.  Such "extraordinary action" does not "happen every year," but rather, functions as a

prophetic call "that probably comes along every 10 years" to draw attention to the sin and

galvanize the community.  Id. at 109.

### 3.    Defendant Mark Colville[15]

Defendant Colville is a Roman Catholic who lives at the Amistad Catholic Worker, a

"house of hospitality" which serves the poor.  Doc. 313 at 67–68.  An extended community

supports his work at the Amistad Catholic Worker, and Colville does not receive any income,

nor does he have a personal bank account.  Id.  He received a bachelor's degree in religious

studies and peace studies and completed a post-graduate degree in theology.  Id.  Colville

describes his Roman Catholic faith as the "rudder of the ship of [his] life."  Id. at 70–71.  While

he "do[esn't] want to break the law[,]" he admits he "has been arrested before" for violating laws

he believes conflict with his faith, a decision he makes despite "significant fear and trembling."

Id. at 83–84.

Colville first became involved with the Plowshares Movement around 1981 when he

attended a prayer vigil after others were arrested.  Id. at 86.  He has participated in two previous

Plowshares actions, both of which "involve[d] the same kind of sacramental action[s]" as his

April 2018 entry onto Kings Bay.  Id. at 94; Doc. 245-1 at 3.  His first Plowshares-related arrest,

which was also his first arrest, occurred in Bath, Maine, in 1997.  Doc. 313 at 94.  Colville

---

[15]    Defendant Colville is proceeding pro se but was assisted by standby counsel at the evidentiary hearing.  Doc. 30; Doc. 58; Doc. 62; Doc. 313 at 66.  Colville adopted the testimony of both defense expert witnesses, as well as his Codefendants' testimony and affidavits.  Doc. 313 at 172–73.  He also adopted and incorporated his prior statements before this Court on May 17, 2018 and Bishop Thomas Gumbleton's declaration.  Doc. 335 at 2 n.2.

testified he received two charges—damage to government property and conspiracy to damage government property—from his participation in that action and was sentenced to 13 months in prison. Id. at 89–90. Colville participated in another Plowshares action on a "nuclear-capable battleship" on the Hudson River in 2003, though he did not receive any criminal charges for his involvement in that incident. Id. at 94.

Additionally, the criminal history records show Colville has had around eight other criminal cases in state and federal courts which ended in some type of final adjudication (including convictions, conditional and unconditional discharges, and deferred sentences).[16] Doc. 306-1 at 59–75; Doc. 313 at 87–90. While the records do not show the underlying acts on which the charges are based, on cross-examination, Colville provided the following details: (1) *December 6, 2000*: arrested and later convicted of disorderly conduct related to a protest at the facility which builds Black Hawk Helicopters; (2) *December 9, 2013*: arrested for criminal contempt and obstruction and later convicted related to protesting at the Hancock Airfield;[17] and (3) *October 20, 2007*: arrested for trespass (convicted of two counts), resisting a public officer (convicted), and injury to real property (dismissed), during another protest. Doc. 313 at 87–89. He also admitted to trespass convictions in 1999 and 2014, a disorderly conduct conviction in 1994, and disorderly conduct arrests in 2010 and 2016. Doc. 306-1 at 59–75; Doc. 313 at 87–90.

---

[16]    Based on the record before the Court, Colville has been convicted in either seven, eight, or nine criminal cases, depending on whether the February 24, 1997 and December 12, 1997 charges are counted separately or together and whether the November 3, 2016 charges are counted at all. Doc. 306-1 at 41–42; Doc. 313 at 87.

[17]    When asked if he received convictions for criminal contempt and obstruction, Coville stated, "If that's what the record says, I won't dispute it." Doc. 313 at 88. The evidence on record shows he pleaded guilty to one count of obstruction and received a conditional discharge for criminal contempt and a second obstruction count. Doc. 306-1 at 466–67.

Colville testified that his religion "teaches that obedience to . . . just laws and to civil law is a virtuous thing," but some laws "directly conflict with the law of God written on our hearts." Doc. 313 at 72; Doc. 245-1 at 2–3.  When these two principles conflict, Colville believes that "the primacy of conscious indicates that when we are placed in that difficult position . . . we have to obey the law of God rather than the law of man . . . ."  Doc. 313 at 72.  Failure to do so is a sin by omission, and "sin is a break in the relationship with God."  Id. at 74.  Colville testified, "[A]s a citizen of the United States, I really have to look at sins of omission as interfering with my relationship with God."  Id.

Colville believes the weapons on Kings Bay "replac[e] God," which is "the Biblical definition of idolatry."  Id.; Doc. 245-1 at 3 ("Nuclearism in the United States . . . has become a compulsory religion, one that . . . requires a faith that is utterly incompatible with the teachings of the Bible.").  His faith, as he understands it, requires that he depend on God alone for "both present and ultimate security."  Doc. 313 at 77.  As a citizen and a Catholic, Colville's faith must "integrate addressing idols," including nuclear weapons.  Id. at 78.  Inaction would "break[] his relationship with God."  Id. at 77, 79.

Colville describes his actions on April 4 and 5 as "perform[ing] the liturgy, which is a sacrament."  Id. at 76.  He "went there in repentance for [his] complicity in the horrible crime of nuclearism and the fact that these weapons are built expressly for the purpose of [his] self-preservation."  Id.  Colville "went there to call" himself and "the people on the base to community, to the beloved community . . . which has been broken and is broken on a daily basis by the presence of that base and those weapons."  Id.

On April 4 and 5, Colville went to the static missile display along with Patrick O'Neill. Id. at 76–77, 116.  In Colville's words, he chose to go to the "shrine to nuclear weapons" to

"address idolatry," as he believes that place was "where nuclear weapons are honored and nuclear policy is held up . . . ." Id. at 77.  "[C]utting through a fence and going onto the base" were things he felt he "had to do . . . in order to be authentic in [his] faith practice."  Id. at 81. His religion does not "counsel [him] to avoid idolatry . . . or . . . simply preach against it; the Bible tells [him] that idols are to be smashed."  Id.

When asked whether his sacramental actions in April 2018 had to happen on the base, Colville replied, "Yes."  Id. 78–79.  The ritual, as a sacrament, was intended to "call[] forth into reality that which is not yet real."  Id.  Hammering, painting, and spilling blood all "specifically address[ed] the idols that are present there."[18]  Id. at 91.  The letters removed from the sign in front of the SWFLANT buildings "unmasked the reality of the idols present" by removing the "official term[s]" which gave the facility "the image of respectability" and was necessary "to achieve what we were trying to achieve, namely, to remove the idols."  Id.; Doc. 245-1 at 4–5.

Colville did not seek permission or provide the base advance notice of his liturgy, as he "wanted it to be a surprise."  Id. at 91.  He testified that seeking permission to enter "would have made our purpose unattainable."  Id. at 92.  Colville explained that the nighttime entry also had a practical advantage, as it made it easier to avoid detection.  Id.  Colville doubted he would have been granted permission if he asked to enter the base for his religious purposes.  Id. at 92–94. However, when asked if he could still perform his liturgy in accordance with his faith if the Government provided "a specific time or area on the base near the site of the sin," Colville replied, "[Y]eah, I mean, absolutely we could have performed the liturgy as a sacrament, yeah." Id. at 95–96.

---

[18]    Colville clarified that he "didn't spray paint anything" but "used a larger marker, a paint marker." Id. at 91.

#### 4.    *Defendant Clare Therese Grady*[19]

Defendant Clare Grady is a lifelong Roman Catholic.  Doc. 316 at 168.  Grady was 59

years old at the time of the incident in question, but when she was in her 20s, she (along with

Elizabeth McAlister) participated in the Griffiss Plowshares action which resulted in a conviction

for destruction of government property.  Doc. 245-2 at 10, 13–16; Doc. 306-1 at 6; Doc. 316 at

197.  Years later, in 2003, she participated in another protest against the Iraq war, and, after a

state court trial ended with a hung jury, she was convicted in federal court and sentenced to six

months in prison.  Doc. 245-1 at 13–14; Doc. 306-1 at 8.  Additionally, Grady has been arrested

multiple times on charges including trespass, unlawful entry on property, obstructing highways,

and disorderly conduct.  Doc. 306-1 at 3–20.  Grady believes she is burdened by "the

criminalization of [her] acts of nonviolent symbolic disarmament" and the "serious charges"

levied against her.  Doc. 316 at 190.

Grady's reading of the Bible and the understandings she derived from it motivated her

actions on April 4 and 5, 2018.  Id. at 174; Doc. 245-2.  In her testimony and her affidavit, she

cited to multiple Biblical passages and religious teachings which informed her faith, including

the Pope's pronouncement "that the mere possession of nuclear weapons . . . is a sin."  Doc. 316

at 177, 187; Doc. 245-2.  She felt called to engage in "nonviolent symbolic disarmament" to

"withdraw[] [her] consent to supporting that weapon system that exists in [her] name."  Doc. 316

at 183–84.  Inaction, coupled with such knowing, would be a sin of omission and cause Grady to

---

[19]    Grady was represented by counsel during the evidentiary hearing, and she testified with the
assistance of counsel.  See Doc. 69; Doc. 73; Doc. 316 at 167.  Grady adopted and incorporated the
testimony of the other witnesses with two caveats.  Doc. 313 at 173.  First, she would not characterize the
symbolic denuclearization as "theatrical," a description given by Defendant O'Neill.  Id.  Secondly, her
actions are not primarily focused on "chang[ing] someone else" but rather "chang[ing] herself and
convey[ing] a message."  Id.

"experience disorder" and make her "complicit in violating a higher law." Id. at 188–89.  To

Grady, Isaiah 2:4 is a call to act out her faith.  Id. at 175.  She analogizes the description of

swords transforming into plowshares to the sacrament of communion.  Id.  Like her belief that

Catholics, through communion, "actually eat the body and drink the blood" of Jesus, Grady

believes that "if you want to disarm, you actually have to hammer swords into plowshares as part

of a spectrum of things that you do."  Id. at 175.  This type of sacramental action "make[s] God's

presence visible on Earth . . . ."  Id. at 184.

On the night in question, Grady went to the SWFLANT building along with Martha

Hennessy before joining Patrick O'Neill and Mark Colville at the static missile display.  Id. at

194–96.  Grady testified she poured blood and spray-painted messages on the sidewalk in front

of the building.  Id.  Crime scene tape, an indictment, and a copy of the book *The Doomsday*

*Machine: Confessions of a Nuclear War Planner* by Daniel Ellsberg were left at the scene.  Id.

She brought with her a hammer "made with metal from melted down guns, weapons converted

into peaceful tools."  Doc. 245-2 at 7.  At some point, Grady used the hammer to "hammer one

of the monuments."  Doc. 316 at 195.  Grady does not believe her actions constituted trespass or

destruction or depredation of property.  Id. at 186.  Rather, "what [she] believed that [she] did

was enflesh the words of Isaiah and carry out nonviolent act of symbolic disarmament."  Id.  She

explained:

> [T]he tool of crime scene tape is used to name the scene and bring caution.  The
> blood . . . is used to reveal the bloodshed that exists now and, as was said earlier,
> also, it's like a symbol of atonement.  The hammer is used in that very physical,
> real way of transformation.  It changes—even though it's a little dent in a piece of
> cement that it—it changes a relationship physically and then beyond that.  The
> spray paint is used to communicate the message.

Id. at 187; Doc. 245-2 at 6–8.

When asked whether her actions needed to take place on the Kings Bay military base, Grady stated that "nonviolent symbolic disarmament . . . of the Trident has to take place where the Trident is, in . . . my practice of my firmly held religious beliefs."  Doc. 316 at 185.  Because the base is the "scene of the sin . . . there's a necessary element of being physically present there and physically present in that way."  Id. at 186.  Grady testified that other actions, such as carrying a banner on a public street, are not equivalent to performing "symbolic disarmament of a Trident submarine."  Id. at 190–91.  She stated, "I think it's great to carry banners . . . But I felt called to do a nonviolent symbolic disarmament of the Trident at that base . . . where the crime is taking place and the harm is."  Id.  Finally, while Grady testified that she did not seek out permission to enter Kings Bay because she "had no reason to believe that they would facilitate nonviolent symbolic disarmament of the kind that [she] practice[s]," she did not testify that her religious exercise required that she enter without permission.  Id. at 197.

### 5.   *Defendant Martha Hennessy[20]*

Martha Hennessy is a Roman Catholic and the granddaughter of Dorothy Day, one of the founders of the Catholic Workers Movement.  Doc. 313 at 21.  She lives at the Catholic Worker House of Hospitality in New York City.  Id.  While April 5, 2018 was Hennessy's first Plowshares-related arrest, Hennessy testified that her "heart has been in" the Plowshares movement since it began in the early 1980s.  Id. at 47–48.  She also stated that she was arrested in December 1979 for the first time for acts "related to the Seabrook Nuclear Power Plant in

---

[20]     Hennessy is represented by counsel in this action.  See Doc. 8; Doc. 21; Doc. 313 at 3, 19–20.  At the evidentiary hearing, Hennessy adopted the testimony of both expert witnesses for the defense and the testimony and affidavits of her Codefendants.  Doc. 313 at 172–73.  Additionally, she adopted and incorporated Bishop Thomas Gumbleton's declaration and any statements she made during her May 17, 2018 detention hearing before the Court.  Doc. 339 at 2 n.2.

New Hampshire."[21]  Id. at 47–48.  She testified her "other arrests were related to the use of

Guantanamo Bay Prison Camp for the torture of prisoners."  Id.  The records provided by the

Government show Hennessy has been arrested at least five times, though nothing in those

records indicates she has ever been convicted.  Doc. 306-1 at 31–37.

Hennessy discussed the various spiritual, religious, and political texts which motivated

her April 2018 actions.  Doc. 313 at 22–30.  In her affidavit, Hennessy wrote that, "[a]s in all

Plowshares actions from the beginning of the movement, inspiration comes from the Scriptural

readings of Isaiah 2:4 to turn swords into plowshares and spears into pruning hooks."  Doc. 245-

3 at 4; Doc. 313 at 29–30 ("Isaiah [2:4] gives us the inspiration and the invitation to disarm.").

She felt driven by a particular sense of urgency after comparing religious texts, including chapter

11 of the Compendium of Social Doctrine of the Church with the updated Nuclear Posture

Review, which she believes indicates the United States Government "will now authorize the

launching of nuclear weapons even against non-nuclear threats."[22]  Doc. 305; Doc. 313 at 26–29

("[L]ooking at the Nuclear Posture Review brings to mind the urgency of now; and of course, in

my lifetime I must examine what is it that is threatening peace in God's creation, and bringing

these two documents together, it became very clear to me what I needed to do with my life.");

Doc. 339 at 18.

Hennessy believes that "going onto that base . . . was both a prophetic and sacramental

act . . . . "  Doc. 313 at 34.  According to Hennessy, "There is no compelling interest in

protecting what is threatening to the death of God and to the death of all of God's creation."  Id.

---

[21]     This arrest is not listed in the criminal history records provided by the Government.  Doc. 306-1
at 31–37.

[22]     Hennessy submitted a copy of the Nuclear Posture Review as an exhibit labeled "Hennessy
Exhibit 1."  Doc. 305; Doc. 313 at 27–29, 64.

at 40.  She testified that she "visited the base as a way of showing that there is a greater law than this compelling interest of protecting and maintaining and threatening to use these weapons."  Id. at 39.  Her goal was "[t]o follow God's will, to warn of the dangers ahead of us, to expose the secrecy of these immoral and illegal weapons, to bring Christ to a place of significant moral failure[,]" and "to withdraw [her] consent from this oppressive, life-threatening, omnicidal process that we're in."  Id. at 30–31; Doc. 245-3 at 5–6 ("I went to expose the nuclear arsenal for what it is, a violation of God's will . . . .").  In her view, she would "be committing sin by way of omission if [she] ignore[d] these realities that [she] ha[s] learned about regarding our nuclear arsenal."  Doc. 313 at 43.  Hennessy testified that the statutes under which she is charged force her to "either turn[] a blind eye to the killing that is going on or . . . choose to submit to state punishment."  Id. at 44–45.  She stated, "Part of my tradition and belief is to take responsibility for taking a stand and then living with the consequences."  Id. at 61.

On the night at issue, Hennessy went to the static missile display near the SWFLANT building.  Id. at 57.  She testified that "the items we used, the tasks we completed [were] all sacramental" and "a critical component" of her religious expression.  Id. at 34, 37.  The blood that was poured was both "a form of sacrifice and atonement" and a "symbolic act of contrition and remorse."  Id. at 34; Doc. 245-3 at 4.  The crime tape "delineate[d] a line that has been crossed and a crime that has been committed."  Doc. 313 at 34.  The messages she testified she spray painted at the base—"May Love Disarm Us All" and "Abolish Nuclear Weapons Now"— included Biblical quotes intended to "call[] to the hearts of others to repent."  Id. at 33–34.  The indictment and the copy of *The Doomsday Machine: Confessions of a Nuclear War Planner* by

Daniel Ellsberg "document[ed] . . . criminality and immorality" and "ask[ed] for justice."[23]  Doc. 245-3 at 5.

Hennessy testified that she believes it was "imperative" to perform symbolic denuclearization on the base at Kings Bay.  Doc. 313 at 58.  When asked whether symbolic disarmament "need[ed] to occur on the military base to express this religious belief," Hennessy replied, "Yes."  Id. at 43, 58.  She agreed that the site gave their actions sacramental significance and later explained that symbolic denuclearization must take place "in the proximity of nuclear weapons."  Id. at 59.  To Hennessy, the location is a necessary element of the exercise because the site "is the place of the greatest sin" and part of her religious exercise aims to "mak[e] scared what has been desecrated."  Id. at 43.  "The idolatry of these weapons and of the missile shrine is where this sin is being committed, and we needed to stand there and be there and pray there and point [it] out."  Id.; Doc. 245-3 at 6 ("Going to the naval base is a way of pointing out our national error and calling for rectification of it.").  However, Hennessy did not testify her religion required that she enter without permission.  Rather, Hennessy did not request permission to enter Kings Bay because past attempts to do so at other locations caused her to believe such an effort would be futile.  Doc. 313 at 55.  When asked if she would be able to "engage in [the] symbolic acts" in a manner "consistent with [her] conscience" on "an area of the base set aside by command[,]" Hennessy replied, "Yes."  Id. at 59.  She also testified, "[I]f we were faced with a ban and bar after our action, I would respect that."  Id. at 56, 58.

---

[23]    Hennessy entered as Hennessy Exhibit 2 a picture of one of the banners into evidence.  Doc. 305-1.  The message displayed on the banner reads: "The Ultimate Logic of the Trident is Omnicide.  We need to disarm now."  Doc. 305-1; Doc. 313 at 36.  She also submitted a picture of the indictment left at the base along with a more legible copy of the same as Hennessy Exhibits 3a and 3b.  Doc. 313 at 36–37.

### 6.     *Defendant Stephen Michael Kelly*[24]

Defendant Stephen Michael Kelly is a Roman Catholic priest.  Doc. 316 at 124.  Father

Kelly has participated in four previous Plowshares actions, at least one of which involved a

military base.  Id. at 134, 161–62.  He has spent over 100 months incarcerated in various jails

and prisons, with over half of that time in solitary confinement.  Doc. 316 at 135.  According to

the records submitted by the Government, in the past, Kelly has been charged with violating

some of the same federal laws he is accused of violating in this action, including conspiracy and

trespass.  Doc. 306-1 at 79–86.

Kelly believes the verse in Isaiah is "not just a slogan" but a "prophetic witness of

conversion" which must "be embodied . . . ."  Id. at 133.  To Kelly, "there is no compatibility

between those nuclear weapons and salvation."  Doc. 316 at 128; see also Doc. 245-4 at 12

("[T]here is simply no way to worship God authentically without addressing idols, or specifically

that with which we have replaced God in the grasping for personal power and ultimate

security.").  Though Kelly sought permission to enter military establishments in some previous

Plowshares events, he did not do so here because he anticipated denial.  Doc. 316 at 151–52.

However, he admits that "perhaps [h]e could have been persuasive in other ways that were not

exhausted."  Id.

Kelly characterizes his April 2018 actions as a form of preaching and describes the three

locations he and his Codefendants went to that evening as the "three parts of our pulpit . . . ."  Id.

at 139.  Their preaching used "elements of the day-to-day existence of the people" to

---

[24]     Kelly, proceeding pro se, testified in narrative form without the assistance of standby counsel.
Doc. 29; Doc. 64; Doc. 316 at 123.  Kelly adopted the testimony of both expert witnesses for the defense
and the testimony and affidavits of his Codefendants.  Doc. 313 at 172–73.  Additionally, he adopted and
incorporated his own testimony from his May 17, 2018 detention hearing and Bishop Thomas
Gumbleton's declaration.  Doc. 336 at 2 n.2.

"symbolically effect preaching the gospel in the locations where those souls habituated."  Doc. 245-4 at 8; Doc. 316 at 138.  They entered "by way of darkness" as a way to "reach into darkness for people who were basically existing in darkness."  Doc. 316 at 135.  Kelly and his companions also brought "bottles of blood and scripture and banners that we thought were part of the truth."  Id. at 153.  The blood was "symbolic of the activity or the end result of those nuclear weapons."  Id. at 129.  The banners "provide[d] a focus for the Word of God."  Doc. 245-4 at 9.

Kelly and two Codefendants entered the "Limited Area" by cutting through concertina wire and a chain-link fence.  Doc. 316 at 154, 157; see also Doc. 245-4 at 9 ("In order to have the gospel message offered in a manner that could not be ignored nor its delivery denied, we breached the fence that was both obscuring the works of hell and making the Marines captive, in need of the truth that these weapons deny God's will that we all live.").  The area was "lit up like a prison" with "many floodlights, and double lines of fences with concertina wire."  Id. at 154–56.  Kelly heard the broadcast system announcing that deadly force was authorized in that area.  Id.  He felt concerned that he or his companions might be shot and "took measures to offset that" by both keeping his Roman collar on and by ensuring the group "present[ed] [them]selves . . . as relatively older folks" and tried to avoid appearing threatening or "look[ing] like commandos."  Id.  Once inside the Limited Area, the group unfurled their banner and began to pray.  Id. at 158.

When asked whether his preaching had to "take place on the military base," Kelly replied, "Yes."  Id. at 114–15.  Kelly believes he needed to bring God's message to the people on the base who are participants in the sin.  Id. at 125; Doc. 245-4 at 7 ("[The] first step was to gain hearers of this Word among base personnel.").  Location was "extremely important," as the group "would be ignored in any other place than right on the site."  Id. at 114–15.  He testified that, in order "to gain access to the people we were trying to reach . . . we clipped the outer

30

perimeter of the gate that surrounds the entire base." Id. at 126.  Because of their method of

entry, Kelly believed base personnel "could not ignore our presence, our commencement of the

liturgy of the Word as we clipped the perimeter lock and thus placed ourselves . . . as a voice in

the Trident wilderness, preparing a way for the Lord among the hearers of the Word."  Doc. 245-

4 at 7–8.

      While Kelly testified that prosecution and imprisonment prevents him from "reach[ing]

the people that . . . are caught up in this" and, thus, "stymie[s] the . . . overall message of the

gospel," he also stated that the criminal proceedings provide additional opportunity for "the

second part of our liturgy of the Word."  Doc. 316 at 147, 160.  He believes his testimony in this

Court's proceedings functions as a continuation of his preaching and witness.  Id. at 160.  When

asked if he would return to the base, Kelly replied, "I would try to gain access to those souls,

yes."  Id.

### 7.   *Defendant Elizabeth McAlister*[25]

      Defendant McAlister is a 79-year-old Roman Catholic.  Doc. 313 at 125–27.  She has a

very small bank account, but she does not own any property.  Id. at 134.  McAlister, along with

her late husband Phil Berrigan, are recognized as two of the founders of the Plowshares

movement.  Id. at 30.  She has been arrested for her participation in one other Plowshares

protest—the Griffiss Plowshares action—which she (along with Codefendant Clare Grady) took

part in about 35 years ago.  Id. at 126–27.  In the early 1970s, she was charged with conspiring to

possess firearms, transport explosives, and kidnap a high government official, but the jury failed

---

[25]     McAlister is represented by counsel and was assisted by counsel at the evidentiary hearing.
Doc. 7; Doc. 30; Doc. 313 at 3, 124–25.  She adopted the testimony of both expert witnesses for the
defense and the testimony and affidavits of her Codefendants.  Doc. 313 at 172–73.  Additionally, she
adopted and incorporated Bishop Thomas Gumbleton's declaration and her own statements from her
detention hearing on May 17, 2018.  Doc. 337 at 2 n.2.

to reach a verdict, and the charges were dismissed.  Id. at 136, 143; Docs. 352; 352-1; 353.  She

has been arrested around 30 times for various federal and state offenses over the course of the

last 40 years.  Id. at 126–27, 136–37, Doc. 306-1 at 39–58.  The criminal history records the

Government provided show McAlister has accumulated at least seven convictions for offenses

like trespass, unlawful entry, destruction of government property, and conspiracy.  Doc. 306-1 at

39–58.

McAlister's religious beliefs about nuclear weapons are not new.  She asserted a similar

defense during her trial for the Griffiss Plowshares action in the 1980s, arguing the Government

"set up a religion protecting nuclear weapons."  Doc. 313 at 130; see also Allen, 760 F.2d at 449

("According to appellants, there has arisen a 'national religion of nuclearism . . . in which the

bomb is the new source of salvation.'").  McAlister believes humanity has "made idols out of

these weapons" and "push[ed] God to the back seat."  Doc. 313 at 131–32.  Through studying

how her religion applied to modern times, she came to "understand that the Fifth Commandment

. . . include[s] thou shall not prepare massive stockpiles of more and more deadly and destructive

weapons to kill and destroy (by now) all the living."  Doc. 245-5 at 4.

Symbolic disarmament, to McAlister, is a sacramental and prophetic action.  Doc. 313 at

141.  Her decision to enter Kings Bay was "seeded and steeped in prayer[,]" and her actions that

evening resulted from her "faith and [her] commitment to challenge the idols whose only

purpose is to destroy human life on an unimaginable scale."  Id. at 139; Doc. 245-5 at 9.  She

"went to Kings[] Bay to use [her] body to refuse to bow down to these idols" and "to bring

attention to the idolatry that it is requiring of our nation and its people."  Doc. 245-5 at 8.  She

"went in a spirit of prayer and repentance" and "in hope that this witness might invite other

people to reflect on the obscenity and on the idolatry that it is before God." Id.  In her affidavit,

McAlister describes the burden she believes she is facing:

> Due to the government's actions, I am faced with the choice of either following
> my conscience and living a life consistent with my faith and beliefs and going to
> jail, or denying the faith and beliefs with which I have tried to live with my whole
> life and staying out of jail.  I am 78 years old.  Going to jail for my beliefs keeps
> me away from my loving children and grandchildren at an important time in their
> lives and mine.  But the idolatry of these nuclear weapons and the government
> which protects their massive destructive power, leave me no choice, I must follow
> my conscience and my faith.

Doc. 245-5 at 1.

On April 4 and 5, 2018, McAlister, along with two of her companions, entered the

Limited Area.  Although she describes the static missile display, which her companions traveled

to, as a "religious symbol" and "shrine," she believed it was necessary to enter the Limited Area

specifically because she "felt called to . . . go close and to go right up front, go right up to it and

say, no, no." Doc. 313 at 131–32.  She testified, "We . . . went as close to the bunkers, the

bunkers that are [where] the nuclear weapons that are stored, as we could possibly get." Id. at

126.  Once at the bunkers, she held a banner and prayed.  Id.; Doc. 245-5 at 8.  She did not seek

permission to enter Kings Bay because she had "asked permission on previous occasions in

previous situations and been denied permission, denied access, denied entrance." Doc. 313 at

140.  When asked if she were offered a location near the nuclear weapons to practice her

religious exercise, she responded that she would "certainly give that prayerful

consideration . . . ." Id. at 142.

8.      *Defendant Patrick O'Neill*[26]

Defendant O'Neill is a Roman Catholic and a self-described "peace Evangelist."  Doc. 313 at 148, 160.  He currently works as a chaplain at Wake Medical Hospital in Raleigh, North Carolina.  Doc. 313 at 148; Doc. 341 at 17.  During his testimony, he "stipulate[d] to the fact that [he] ha[s] a long, ongoing criminal history."  Doc. 313 at 161.  O'Neill participated in a prior Plowshares action in Orlando in 1992 and was convicted of conspiracy and damage to Army property, which he admits are "[a]lmost the same charges as here."[27]  Id. at 145; 161.  It is not clear from the record whether any of his other arrests were part of the Plowshares movement, but most seem to involve similar protest-related activities.  O'Neill claimed he has "been arrested seven times at the Pentagon alone."  Id. at 145, 161.  Two of his past arrests at the Pentagon involved throwing blood.  Id.  He has been charged with trespassing on an Air Force base and impeding traffic at Fort Bragg.  Id.  O'Neill did not request permission to enter Kings Bay because he believed such a request would be futile.  He testified that other military bases have denied him entry in the past even when the base is otherwise open to the public.  Id. at 164.  He testified that he has been arrested "three different times" while seeking permission to enter different military bases, though none of those arrests resulted in convictions.  Id.

---

[26]      O'Neill is proceeding pro se but was assisted by standby counsel during the evidentiary hearing. Doc. 32; Doc. 65; Doc. 313 at 3.  However, O'Neill declined to have his standby counsel help with his testimony and testified instead through narrative form.  Doc. 313 at 144–45.  At the evidentiary hearing, he adopted the testimony of both expert witnesses for the defense and the testimony and affidavits of his Codefendants.  Doc. 313 at 172–73.  Additionally, in his briefing, he adopted and incorporated Bishop Thomas Gumbleton's declaration and his own statements from his detention hearing on May 17, 2018. Doc. 341 at 2 n.2.

[27]      O'Neill testified that he was arrested in Orlando in 1992 for his participation in a Plowshares action.  Id. at 161.  The records provided show nine arrests, five of which ended in convictions, but the records do not contain an arrest report from the state of Florida.  Doc. 306-1 at 98–106.  However, the records do show an August 31, 1992 probation violation with an unknown disposition.  Id.

O'Neill asserts his activism is motivated by his hopes of "preserving life" and "sav[ing] the world from destruction." Id. at 148–49. He believes that, "[a]s a global community, human beings have come to accept the prospect of nuclear annihilation of the planet as an acceptable risk." Doc. 245-6 at 3. He believes that "[t]he Trident II D5 missile equals the opposite of God. It is absolutely a sin." Id. at 151.

O'Neill feels religiously compelled to take action against what he considers to be an "omnicidal" weapon that threatens all of humanity. Id. at 157; Doc. 245-6 at 3. This requires more than simply passive dissent. Doc. 245-6 at 2–4. Rather, to live his faith, O'Neill must "act against evil." Id. In his affidavit, he states that "[t]o be Christian in America is to offer our lives to disarm all weapons." Id. He believes that he "cannot at once be Catholic and not seek to disarm nuclear weapons in our country." Id. O'Neill testified that "[o]ne of the things that the Kings Bay Plowshares represent, and it's part of [the] religious faith, is identifying the sin, naming the sin and opposing the sin, dissenting to the sin." Doc. 313 at 157. He "came to Kings Bay to recognize the sin of Trident, specifically the sin of the D5 missile. It is the most insidious, deadliest, horrific weapon ever built. It has no right to exist." Id. at 151–52. "[T]he seven of us went to Kings Bay to say no to that abomination, no to that sin." Id. The symbolic disarmament was "an attempt to allow the Holy Spirit and the will of God to act through the seven of us to protect all of God's creation." Doc. 245-6 at 3. He believes his actions in April 2018 are "what Jesus would do if He were here in person[.]" Id. ("I believe He would organize, as he did, and he would literally try to disarm that which would destroy all of His Earthly creation.").

After entering the base, O'Neill went to the static missile display. Doc. 52 at 10, 12–13; Doc. 316 at 195. He characterized the group's actions on the base as "theatrical," and stated that,

35

"in order to get some attention to this issue, we had to do something spectacular."  Doc. 313 at

155–56.  "We had to be dramatic because that's the only way that we got the attention of the

government.  We came there and said, look what you're doing here, and we did it dramatically,

and we did it in a way that demanded that they pay attention to us . . . ."  Id. at 169–70.

O'Neill testified about how his belief that the criminal statutes and their enforcement

against him in this action burden his faith.  Id. at 158–59.  The ankle monitor he wears as part of

the conditions for his pre-trial release makes his work as a chaplain more difficult.  Id.  He

believes his faith calls him to "speak up in defense" of others and to "take on the burdens of

those who are powerless."  Id.  His arrest and prosecution are ways of sharing in the burden of

others who are targeted or impacted by the United States nuclear policy but are unable to stand

up for themselves.  Id.

O'Neill's testimony also shows that the ongoing criminal proceedings against him

created an opportunity to continue the conversation and, thus, his role as a religious witness.  Id.

At the evidentiary hearing, he testified that because the acts were so sensational, "we're all

gathered in the courtroom talking about it now."  Id.  "[B]ecause we were theatrical and because

we did these kind of wild things, for lack of a better word, we're having this conversation . . . ."

Id.  He stated: "If we'd come to the base and just held up signs, this would not happen.  The

Trident wouldn't be on trial."  He continued, "[W]e have forced a conversation to go to a place

where people don't want it to go."  Id. at 156–57.

O'Neill testified that the Kings Bay action, while spectacular and theatrical, was also

sacramental and prophetic.  Id. at 166–70.  O'Neill believes that he and his companions

"engage[d] in prophetic acts" on Kings Bay.  Id.  However, he does not feel comfortable

"refer[ring] to [him]self as a prophet," nor does he intend to "declare [him]self as knowing for

sure that [he's] done God's will." Id. at 168–171.  However, he believes that actions done

"because of . . . fidelity to God, even if it isn't necessarily what God wanted" are divine.  Id.  His

acts on Kings Bay were his attempt to enact what he believes to be God's will.  Id. at 170–71.

O'Neill testified that he had to enter the base to symbolically disarm it because the base is

"the place where the sin is being committed."  Id. at 151–52.  When asked whether he could still

perform the sacrament if the Government provided a designated time and place on the base,

O'Neill did not reject that idea outright.  Id. at 168.  Rather, he replied that the idea "sounds

interesting" and something he "would want to hear more about."  Id.  He agreed that, in his mind,

symbolic denuclearization does not have to be done without permission.  Id.  O'Neill also stated

that, in some of his prior attempts to demonstrate on a military base, he "wasn't arrested" but

was "given a ban and bar letter."  Id. at 171.  He testified that "on April 5th if somebody had

handed me a ban and bar letter, I would have hit I-95 as quickly as possible heading home, and I

wouldn't have come back."  Id. at 169.

### 9.     *Defendant Carmen Trotta*[28]

Carmen Trotta is a Roman Catholic who has lived and worked at the New York Catholic

Worker, a house of hospitality, for the past 30 years.  Doc. 313 at 98–99.  Trotta does not have a

bank account or personal income.  Id.  He has a bachelor's degree in religious studies from

Grinnell College.  Id.  Trotta's criminal history records show he has been arrested at least eight

times for offenses which include criminal trespass, disorderly conduct, obstruction, blocking

---

[28]     Trotta is proceeding pro se, but standby counsel was present to assist him during the evidentiary hearing, and he testified with the assistance of standby counsel.  Doc. 33; Doc. 66; Doc. 313 at 3, 97–98. At the evidentiary hearing, he adopted the testimony of both expert witnesses for the defense and the testimony and affidavits of his Codefendants.  Doc. 313 at 172–74.  Additionally, in his briefing, he adopted and incorporated his own statements at his May 17, 2018 detention hearing, as well as Bishop Thomas Gumbleton's declaration.  Doc. 342 at 2 n.2.

passage, and displaying a banner at the Supreme Court.  <u>Id.</u> at 119–22; Doc. 306-1 at 21–29.

From those eight arrests, he has been convicted twice, receiving 10 days in jail in 2008 and six

months of unsupervised probation in 2011.  Doc. 306-1 at 21–29.  According to Trotta, "all of

[his] arrests, there[] [was] no violence, no theft, no destruction of government property, with the

exception of the sub base here."  <u>Id.</u> at 120–21.  "[I]n every case, we said that the law was on our

side."  <u>Id.</u>

      Trotta stated that "regard[ing] nuclear weapons, the church calls for law . . . that comes

from something that sort of supersedes the American courts . . . a stronger force of law."  <u>Id.</u> at

102.  Part of the core of his faith involves "a face-off with empire."  <u>Id.</u>; Doc. 245-7 at 2.  His

study of religious texts and sermons informs his belief that "the United States is in rebellion

against God and has run off the rails really in its utilization of war crimes which go on to this

day."  Doc. 313 at 110.  In his view, one of these "war crimes" is the national security focus on

nuclear weapons, the "very possession" of which is to be "be firmly condemned."  <u>Id.</u> at 107.  To

Trotta, Kings Bay "is rebellion against God."  <u>Id.</u> at 105–06.

      Trotta believes that in Isaiah 2:4, "the prophet declares that God is going to get the great

nations together and He's going to set terms."  <u>Id.</u> at 104.  He explained, "God is coming

together with our coming together.  And when we come together, He is going to set terms—set

terms means treaties—that . . . nations will no longer make war against one another . . . ."  <u>Id.</u>

He further testified, "God has asked us to come together as a community, and I look at the

Isaiahan text and say that, indeed, we do need to do that.  To beat swords into plough shares [sic]

is the only way to do that."  <u>Id.</u> at 110.  "If we refuse to make this effort, we do not know where

we will be led by the evil road we have set upon."  Doc. 245-7 at 9.

Trotta also discussed how the existence and enforcement of criminal laws against him burdens his religious beliefs.  While incarcerated, he could not continue his work in the community or at the Catholic Worker, and the conditions of his pretrial release make caring for his sick father more difficult and prevent him from traveling and attending vigils for victims of human rights violations.  Doc. 313 at 113.

Trotta is one of three Defendants who, after entering the base, traveled onward and crossed into the Limited Area.  Doc. 245-7 at 9–10; Doc. 313 at 106–07, 116–18.  He heard the broadcast warning that lethal force could be used against him, but that did not deter his approach.  Doc. 313 at 117–18.  Trotta testified that both the decision and the approach took "extraordinary act[s] of will."  Id.  He testified that, after "quite a bit of discernment," he came to decide that if he died as a result, his death "would be a worthy sacrifice."  Id.  Trotta testified that he would have "no hesitation to actually bang on the side of a ship or to destroy some of the nuclear-related hardware."  Id. at 106–07.  "We were a bit disappointed that there was no submarine on the base while we were there."  Id.

When asked why the symbolic nuclear disarmament had to occur on Kings Bay, Trotta responded, "Because that was the scene of the crime."  Id. at 110.  As sacraments require "physical sign[s] of a spiritual reality," a "part of the sacramental nature" of his religious exercise required he "go where the real elements are."  Id. at 106, 110.  To Trotta, the location created a type of "sacramental presence[,]" which he analogized is similar to how "every Roman Catholic Church has a relic, has a remnant of a saint inside the church."  Id. at 110.  He explained, "We wanted to go to the scene of the crime.  We wanted to expose that crime for exactly what it was.  We wanted, as we said, to bring back the eminence of God to a desecrated earth."  Id. at 106.

**DISCUSSION**

## I.    Legal Standards

Defendants bring their Motions under Rule 12(b)(3) of the Federal Rules of Criminal

Procedure.  Doc. 87 at 1; Doc. 89 at 1–2.  Under Federal Rule of Criminal Procedure 12(b)(3),

criminal defendants must raise certain defenses that "can be determined without a trial on the

merits" by pre-trial motion.  Fed. R. Crim. P. 12(b)(3); United States v. Sperrazza, 804 F.3d

1113, 1118–19 (11th Cir. 2015); see also Fed. R. Crim. P. 12(b)(3)(A)(iv) (selective

prosecution); Fed. R. Crim. P. 12(b)(3)(B)(i) (duplicity); Fed. R. Crim. P. 12(b)(3)(B)(ii)

(multiplicity); Fed. R. Crim. P. 12(b)(3)(B)(v) (failure to state an offense).

## II.   The RFRA Defense

Defendants move to dismiss the charges against them, arguing that the prosecution in this

case is barred by RFRA.[29]  Congress enacted RFRA "in order to provide very broad protection

for religious liberty."[30]  Holt v. Hobbs, 135 S. Ct. 853, 859 (2015); Burwell v. Hobby Lobby

Stores, Inc., 573 U.S. 682, 693 (2014).  RFRA was a direct response to Employment Division,

Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), where the Court

found the Free Exercise Clause did not apply to laws of neutral applicability.  Hobby Lobby, 573

---

[29]    It is appropriate for the Court to consider Defendants' RFRA defense in the context of a Rule 12(b) motion to dismiss.  First, the Eleventh Circuit has deemed a RFRA defense to be a question of law that need not be submitted to the jury.  See United States v. Duncan, 356 F. App'x 250, 253 (11th Cir. 2009) (quoting Lawson v. Singletary, 85 F.3d 502, 511–12 (11th Cir. 1996)).  Second, the Court conducted an extensive evidentiary hearing, during which Defendants were able to address any disputed facts and to challenge any evidence presented by the Government.  Following that hearing, it does not appear Defendants dispute any material facts related to the RFRA defense.  See Doc. 245-6 at 2.

[30]    In City of Boerne v. Flores, the Supreme Court found RFRA unconstitutional as applied to the states.  521 U.S. 507 (1997).  Congress responded by passing the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which "imposes the same general test as RFRA but on a more limited category of governmental actions."  Hobby Lobby, 573 U.S. at 695, 730 (referring to RLUIPA and RFRA as "sister statutes").  Thus, RLUIPA case law is relevant in determining a RFRA claim.

U.S. at 693–94.  Concerned that <u>Smith</u> "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," Congress enacted RFRA in 1993 to ensure religious liberty received even stronger protections than what was constitutionally required.  <u>Id.</u> at 706; <u>Holt</u>, 135 S. Ct. at 859.  In restoring and strengthening the compelling interest test, Congress created a statutory mandate to "provid[e] greater protection for religious exercise than is available under the First Amendment."  <u>Holt</u>, 135 S. Ct. at 859–60.

RFRA requires courts to "strik[e] sensible balances between religious liberty and competing prior government interests" when Government activity substantially burdens a sincere religious exercise.  §§ 2000bb(a)(5), 2000bb-1; <u>Gonzalez v. O Centro Espirita Beneficente Uniao de Vegetal</u>, 546 U.S. 418, 421 (2006).  RFRA requires courts to examine the law and, if necessary, to create exceptions for religious conduct, even if those exceptions require affirmative actions or increased costs for the Government.  <u>Hobby Lobby</u>, 573 U.S. at 730 (RFRA "may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs."); <u>Yellowbear v. Lampert</u>, 741 F.3d 48, 62 (10th Cir. 2014) ("The whole point of RFRA and RLUIPA *is to make exceptions* for those sincerely seeking to exercise religion.").

RFRA forbids the Government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability."  § 2000bb-1(a).  Under RFRA, "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  § 2000bb-1(c).  When the law burdening religion results in a criminal prosecution, defendants may raise a RFRA defense "in hopes of beating back the government's

charge."[31] United States v. Christie, 825 F.3d 1048, 1055 (9th Cir. 2016); see, e.g., United States v. Stimler, 864 F.3d 253, 268 (3d Cir. 2017); United States v. Ali, 683 F.3d 705, 710 (8th Cir. 2012); United States v. Wilgus, 638 F.3d 1274, 1279 (10th Cir. 2011); United States v. Quaintance, 608 F.3d 717, 719 (10th Cir. 2010); United States v. Bauer, 84 F.3d 1549, 1559 (9th Cir. 1996); United States v. Hutson, No. 16-CR-00186, 2018 WL 345316, at *2 (D. Colo. Jan. 10, 2018); United States v. Martines, 903 F. Supp. 2d 1061, 1064 (D. Haw. 2012).

To make a prima facie RFRA showing, the religious objector must show the government action has (1) substantially burdened a (2) sincere (3) religious exercise.  However, "[t]he mere fact that [a] religious practice is [substantially] burdened by a governmental program does not mean that an exemption accommodating [the] practice must be granted." Thomas v. Review Bd. of Ind. Emp't Sec. Div., 450 U.S. 707, 718 (1981).  Rather, the Government can still defeat a RFRA claim by showing the law burdening religion is the least restrictive means of furthering a compelling government interest.  Davila v. Gladden, 777 F.3d 1198, 1204 (11th Cir. 2015).

Here, the Government contests all elements of Defendants' prima facie case.  While agreeing that "Defendants sincerely hold the beliefs regarding nuclear weapons they espouse" and "that the practice of Catholicism is religious," the Government argues that Defendants do not sincerely believe that their April 2018 actions at Kings Bay constituted a religious exercise. Doc. 214 at 2; Doc. 227 at 7, 9–10.  Rather, according to the Government, Defendants' conduct

---

[31]    Some courts have conceptualized RFRA as an affirmative defense, akin to immunity, when it is used to defend against criminal charges.  United States v. Hutson, No. 16-CR-00186, 2018 WL 345316, at *2 (D. Colo. Jan. 10, 2018) ("Courts have recognized RFRA as creating an affirmative defense that the accused can raise in a criminal prosecution."); United States v. Christie, 825 F.3d 1048, 1065 (9th Cir. 2016) (finding RFRA operates as "an affirmative defense to criminal prosecution" which "may have the effect of immunizing the objector's past conduct from official sanction . . . and nullifying, in whole or in part, his continuing duty to comply with a generally applicable command"); United States v. Martines, 903 F. Supp. 2d 1061, 1064 (D. Haw. 2012) ("A successful RFRA defense would essentially preclude the government from prosecuting at all.").

and subsequent RFRA defense "reflect[] an effort to propagandize and obtain secular public policy revisions tinged with post-hoc religious justification." Doc. 227 at 10. Moreover, the Government argues that no substantial burden exists because the laws under which Defendants are prosecuted do not prevent or compel them from engaging in their religious activity. Id. at 4–8. Although the Government discusses the availability of "alternative ways for Defendants to engage in the religious exercise at issue," at heart, what the Government is arguing is that Defendants' religious beliefs, as articulated, do not conflict with the objective functions of the laws under which they are charged. Id.; Doc. 340 at 1–5.

This Court must determine whether: (1) Defendants' April 2018 conduct was motivated by religious (as opposed to philosophical or moral) beliefs; (2) Defendants sincerely hold those religious beliefs; and (3) the statutes under which the Defendants are prosecuted substantially burden Defendants' religion. If the answer to all three questions is yes, the Court must also determine whether the laws at issue further a compelling governmental interest and whether any less restrictive alternatives exist.

### A.    Religious Exercise

RFRA protects only religious exercises but defines that term expansively to cover a wide range of religiously motivated activity. Under RFRA, religious exercise encompasses "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."[32]

---

[32]    RFRA previously defined religious exercise as "the exercise of religion under the First Amendment." RLUIPA amended RFRA and incorporated a more expansive definition of religious exercise. 42 U.S.C. § 2000bb-2(4); 42 U.S.C. § 2000cc-5(7)(A); Hobby Lobby, 573 U.S. at 695–96. "[I]n an obvious effort to effect a complete separation from First Amendment case law," Congress expanded the definition of religious exercise and removed any reference to the First Amendment. Hobby Lobby, 573 U.S. at 695–96. Though RFRA does not directly incorporate all of RLUIPA's subparts, the Supreme Court has found "[t]he 'exercise of religion' under RFRA must be given the same broad meaning that applies under RLUIPA." Id. at 696 n.5. Thus, both RFRA and RLUIPA should be

§ 2000bb-2(4); § 2000cc-5(7)(A); <u>Yellowbear</u>, 741 F.3d at 54 ("RFRA protects any exercise of a

sincerely held religious belief."); <u>Sims v. Owens</u>, No. 5:13-cv-385, 2016 WL 4253969, at *5

(M.D. Ga. July 22, 2016) (noting that protected religious exercises include acts "which hold

religious meaning but are not strictly mandated").  Exercises of religion include "'belief and

profession,'" as well as "'performance[s] of (or abstention[s] from) physical acts' that are

'engaged in for religious reasons.'" <u>Hobby Lobby</u>, 573 U.S. at 710 (quoting <u>Smith</u>, 494 U.S. at

877).

   However, in order to take shelter under the statute, claimants must first show the exercise

they seek to protect is religious in nature.  <u>United States v. Zimmerman</u>, 514 F.3d 851, 853–54

(9th Cir. 2007); <u>Cavanaugh v. Bartelt</u>, 178 F. Supp. 3d 819, 829–30 (D. Neb. 2016).  RFRA only

protects activities "motivated by religious faith" not by "personal conscience or philosophical

conviction."  <u>Yellowbear</u>, 741 F.3d at 53; <u>United States v. Jeffs</u>, No. 2:16-CR-82, 2016 WL

6745951, at *3 (D. Utah Nov. 15, 2016).  A claimant cannot bring a RFRA claim to protect

secular, philosophical, or strictly moral convictions, no matter how deeply held.  <u>Yellowbear</u>,

741 F.3d at 53–55; <u>United State v. Meyers</u>, 95 F.3d 1475, 1484 (10th Cir. 1996); <u>Hutson</u>, 2018

WL 345316, at *5.  Thus, determining whether an act is, at its core, religious, forces courts into

the "tricky business" of "separat[ing] the sacred from the secular."  <u>Yellowbear</u>, 741 F.3d at 54.

   This analysis places courts in a difficult position as religion is, at its core, ineffable.

Courts "must not presume to determine . . . the plausibility of a religious claim."  <u>Hobby Lobby</u>,

573 U.S. at 724 (quoting <u>Smith</u>, 494 U.S. at 887); <u>Yellowbear</u>, 741 F.3d at 54 ("[F]ederal judges

are hardly fit arbiters of the world's religions.").  Valid religious activity does not need to be

_____

"construed in favor of a broad protection of religious exercise . . . ." <u>Id.</u> at 696 n.5; <u>see also</u> 42 U.S.C.
§ 2000cc-3.

objectively reasonable or even "acceptable, logical, consistent, or comprehensible to others."

Davila, 777 F.3d at 1204 (quoting Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1297 (11th Cir.

2007)).  The inquiry is, therefore, necessarily limited to determining whether the activity is born

of a religious, as opposed to secular, belief.  Hutson, 2018 WL 345316, at *3 ("The Supreme

Court clearly distinguishes between beliefs that are religious in nature and those that are based

on 'purely secular considerations.'" (quoting Wisconsin v. Yoder, 406 U.S. 205, 216 (1972))).

It is easiest to understand the narrow function the court must perform by considering

what courts are forbidden to do.  "It is not for the Court to say that the religious beliefs of the

[claimants] are mistaken or unreasonable."  Hobby Lobby, 573 U.S. at 686.  Judges cannot

arbitrate questions related to "the centrality of particular beliefs or practices to a faith, or the

validity of particular litigants' interpretations of those creeds."  Davila, 777 F.3d at 1204

(quoting Hernandez v. Comm'r, 490 U.S. 680, 699 (1989)).  RFRA's protections encompass

beliefs which are debated, unsettled, or undecided within the confines of the particular religion.

See, e.g., Thomas, 450 U.S. at 708 (RFRA's protections are "not limited to beliefs which are

shared by all members of a religious sect."); Yellowbear, 741 F.3d at 54 (Courts "lack any

license to determine the relative value of a particular exercise to a religion."); Ali, 683 F.3d at

710.  If a claimant sincerely believes his religion requires a particular action or inaction, courts

cannot parse through the ecclesiastical questions of the centrality, importance, or general

acceptance of that religious exercise in the broader religious scheme.  See Zimmerman, 514 F.3d

at 854 (finding a claimant's refusal to provide a blood sample, "[w]hile not a mainstream or

common interpretation of the Bible," was based in "a connection with God, not purely on secular

philosophical concerns"); Love v. Reed, 216 F.3d 682, 688–89 (8th Cir. 2000); Hutson, 2018

WL 345316, at *4 (finding sovereign citizen views were not, as a whole, religious but still

analyzing whether the claimant's individual sovereign citizen beliefs stemmed from a religious motivation).

Of course, religious and secular beliefs may overlap, particularly when religious beliefs inform opinions on law and policy. Love, 216 F.3d at 689 ("[A] belief can be both secular and religious. These categories are not mutually exclusive."); Meyers, 95 F.3d at 1484 (finding the Reverend of the Church of Marijuana's beliefs were not religious because his "secular and religious beliefs overlap[ped] only in the sense that [he] holds secular beliefs which he believes so deeply that he has transformed them into a 'religion'" with an "ad hoc quality that neatly justif[ies] his desire to smoke marijuana").

The Government does not contest that Catholicism is religious. Doc. 227 at 10. All seven Defendants are practicing Catholics, and several of them live their lives in accordance with Catholic Worker traditions.[33] However, the Government argues Defendants do not show the "unique religious function" of "breaking a padlock on a naval fence, cutting fences on a naval installation, spreading blood, and spray-painting . . . ." Id. at 6. According to the Government, Defendants' conduct "reflects an effort to propagandize and obtain secular public policy revisions tinged with post-hoc religious justification." Id. at 10.

Based on all the evidence in this record, I find that Defendants' April 2018 actions on Kings Bay were religious in nature. By engaging in symbolic disarmament, Defendants believe they symbolically challenged the role of the Trident missile, which is, in their view, a "false

---

[33]     A "Catholic Worker" is not a different sect or religion apart from Catholicism. Rather, the phrase is better understood as a lifestyle by which some Catholics engage with the world. Doc. 313 at 21–23.

idol."[34]  Defendants embraced and repeated Pope Francis's message condemning the very

possession of nuclear weapons as against God.  The materials Defendants used had a religious

and "symbolic dimension."  Doc. 316 at 71.  Defendants belief that the Kings Bay base has been

"desecrated" and their actions attempting to "reconsecrate" the land were, consequently,

sacramental actions, in Defendants' view.  Defendants' actions were aimed at bringing the

"world back to a place of loving God and loving neighbor" and transforming "systems and

structures" to reflect the love of God and the rejection of violence, and Defendants believed these

actions to be religious prophetic actions.  See, e.g., id. at 71–72.  While Defendants do intend

their religious exercise to have public policy impact, and thus have secular goals, I find, based on

their testimony and evidence of record as well as my observations of their conduct and behavior

at their appearances before this Court, that Defendants' desire to change public policy arises

from their religious views.  The secular impact, in other words, is motivated by a religious belief.

Their religious beliefs were prominent during the planning and execution of the April 2018

action and their defense in this case.  This is not a situation where Defendants' religious views

reflect an "ad hoc quality that neatly justif[ies]" the contested activity.  Therefore, I find that

Defendants' beliefs and the actions on April 4–5, 2018 that were motivated by those beliefs were

"religious" for the purposes of the RFRA analysis.[35]

---

[34]    Because each Defendant testified as to their own sincerely held religious beliefs, some minor
nuances exist between the testimonies.  Regardless, the linchpin of this part of the RFRA analysis is the
religious function of the action, and Defendants testified consistently about the religious nature of their
practice and the sacramental and prophetic functions of symbolic nuclear disarmament.

[35]    In Meyers, the Tenth Circuit adopted a five-factor test for evaluating whether a belief or exercise
originates in religion, considering: ultimate ideas, metaphysical beliefs, moral and ethical systems,
comprehensive beliefs, and accoutrements of religion.  95 F.3d at 1484.  Although the Eleventh Circuit
has not adopted this five-factor test, were the test to be applied here, I would find that all five factors
support the conclusion that Defendants' beliefs and exercise originate in religion.

**B.**     **Sincerity**

Having decided the Defendants' activities are based in their religion, as they understand it, the Court turns to the question of whether Defendants' beliefs are sincerely held.  Based on my observations of Defendants' demeanor and credibility during the evidentiary hearing and at other appearances before this Court, as well as my review of the record, I find that Defendants have credibly shown that they sincerely believe that symbolic disarmament is a religious exercise.

While "the 'truth' of a belief is not open to question," courts may examine whether the beliefs are truly held.  Cutter v. Wilkinson, 544 U.S. 709, 725 n.13 (2005) (quoting Gillette v. United States, 401 U.S. 437, 457 (1971)); see also Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs., 818 F.3d 1122, 1143 (11th Cir. 2016) ("A threshold question we must ask is whether the plaintiffs' religious beliefs on which their RFRA claims are based are sincere."); Watts, 495 F.3d at 1296–97; Sims, 2016 WL 4253969, at *5.  In determining the sincerity of a religious belief, the courts' "narrow function" is to assess "whether the line drawn between conduct that is and is not permitted under one's religion reflects an honest conviction."  Davila, 777 F.3d at 1204 (citing Hobby Lobby, 573 U.S. at 725).  The question is only "whether 'the claimant is (in essence) seeking to perpetrate a fraud on the court—whether he actually holds the beliefs he claims to hold."  Davila, 777 F.3d at 1204 (quoting Yellowbear, 741 F.3d at 54); see also Eternal Word, 818 F.3d at 1143 ("It is well established that we defer to a plaintiff's statement of its own belief, so long as the plaintiff actually holds that belief."); Gardner v. Riska, 444 F. App'x 353, 355 (11th Cir. 2011); United States v. Sterling, 75 M.J. 407, 414–16 (C.A.A.F. 2016).  This test is largely subjective, but courts should asses the credibility of the adherent in making this determination.  See Watts, 495

F.3d at 1298–99; <u>Zimmerman</u>, 514 F.3d at 851 ("[C]redibility and demeanor will bear heavily on whether . . . beliefs are sincerely held."); <u>Sims</u>, 2016 WL 4253969, at *5 ("[T]he Court considers Plaintiff's statements of his beliefs and his practices to determine whether his request . . . is motivated by a sincerely held religious belief.").

During the two-day evidentiary hearing, each Defendant testified credibly and consistently that he or she sincerely believes that nuclear weapons and the United States Government's possession of such weapons are not simply undesirable but are fundamentally evil and sinful. Furthermore, each Defendant believes that he or she was compelled by their religious beliefs, their primacy of conscience, and ultimately, by God, to demonstrate and take action in opposition to the presence of nuclear weapons at Kings Bay. The undersigned has no doubt that each Defendant actually and genuinely holds these beliefs, and, therefore, "sincerely" holds these religious beliefs for the purposes of the RFRA analysis.

### C. Substantial Burden

RFRA is only triggered when a sincerely held religious belief is substantially burdened by a governmental law or policy. <u>Holt</u>, 135 S. Ct. at 862. The Eleventh Circuit gives "substantial burden" its "ordinary" or "natural" meaning. <u>Midrash Sephardi, Inc. v. Town of Surfside</u>, 366 F.3d 1214, 1226 (11th Cir. 2004). In requiring claimants to show a *substantial* burden, Congress inherently permitted Government activity which only creates minor or *de minimis* burdens on religious activity. <u>Eternal Word</u>, 818 F.3d at 1147 & n.27; <u>Kaemmerling v. Lappin</u>, 553 F.3d 669, 678 (D.C. Cir. 2008) ("[A]n inconsequential or *de minimis* burden on religious practice does not [constitute a substantial burden], nor does a burden on activity unimportant to the adherent's religious scheme."); <u>Navajo Nation v. U.S. Forest Serv.</u>, 535 F.3d 1058, 1069–70 (9th Cir. 2008); <u>Midrash</u>, 366 F.3d at 1227. Rather, to be substantial, the

49

governmental action must have "more than an incidental effect" and must "place more than an inconvenience on religious exercise.'" Midrash, 366 F.3d at 1227; see also Smith, 502 F.3d at 1278 (finding a substantial burden "must, at a minimum, be construed as meaning something more than solely the denial of a request that is sincere").

The substantial burden analysis does not consider the availability (or lack thereof) of alternative religious practices. Holt, 135 S. Ct. at 862 (finding "the availability of alternative means of practicing religion" is not a relevant consideration under RLUIPA); Benning v. Georgia, 845 F. Supp. 2d 1372 (M.D. Ga. 2012). Rather, a burden is substantial when the law or policy: "(1) requires the claimant to participate in an activity prohibited by a sincerely held religious belief, (2) prevents the claimant from participating in an activity motivated by a sincerely held religious belief, or (3) places significant pressure on claimant to violate a sincerely held religious belief." Yellowbear, 741 F.3d at 55; Eternal Word, 818 F.3d at 1122, 1144; Davila, 777 F.3d at 1205 (quoting Yellowbear, 741 F.3d at 55); Smith, 502 F.3d at 1269 ("[T]o constitute a substantial burden under [RFRA], the government action must significantly hamper one's religious practice."); Midrash, 366 F.3d at 1227. Government action creates significant pressure if it "tends to force adherents to forego religious precepts" or "directly coerces the religious adherent to conform . . . her behavior." Eternal Word, 818 F.3d at 1144 (quoting Midrash, 366 F.3d at 1227). The focus is on the level and impact of the governmental coercion. Id. at 1148; Yellowbear, 741 F.3d at 55 ("[T]he inquiry focuses only on the coercive impact of the government's actions."); Jeffs, 2016 WL 6745951, at *9 (holding that the substantial burden analysis "looks to the intensity of the coercion applied by the government to act contrary to [religious] beliefs").

The substantial burden inquiry has an objective and a subjective dimension.  Eternal

Word, 818 F.3d at 1144.  The subjective component requires courts to "accept a religious

adherent's assertion that his religious beliefs require him to take or abstain from taking a

specified action."  Id.  Where a religious adherent credibly asserts that a practice or exercise is

important to her religion, courts should not become "arbiters of scriptural interpretation" by

evaluating the degree of religious importance attached to the exercise.  Thomas, 450 U.S. at 716;

see also Hobby Lobby, 573 U.S. at 725 ("[I]t is not for us to say that [a claimant's] religious

beliefs are mistaken or insubstantial."); Wilkinson v. Sec'y, Fla. Dep't of Corr., 622 F. App'x

805, 815 (11th Cir. 2015) (finding refusal to let a Santeria practitioner celebrate holy days with

other Santeria practitioners constituted a substantial burden, even though the practitioner could

observe the holy days in private because the petitioner asserted his religious beliefs required

communal celebration); Yellowbear, 741 F.3d at 55 ("When a sincere religious claimant draws a

line ruling in or out a particular religious exercise, 'it is not for us to say that the line [they] drew

was an unreasonable one.'" (quoting Thomas, 450 U.S. at 716)); Smith, 502 F.3d at 1278

("[C]ourts are not to inquire into the centrality of a particular religious tenant in undertaking the

substantial burden analysis[.]"); Sterling, 75 M.J. at 417 (requiring claimants show "an honest

belief that the practice is important to [their] free exercise of religion" but declining to "assess

the importance of a religious practice to a practitioner's exercise of religion or impose any type

of centrality test"); Benning, 845 F. Supp. at 1380 (noting that RLUIPA "cautions against"

weighing "the 'centrality' of one religious belief against another" in determining a substantial

burden).

Rather than simply "rubber stamp" a claimant's assertion that the law burdens their

religious exercise, the substantial burden prong also requires courts to engage in an objective

inquiry into how the law actually functions.  Eternal Word, 818 F.3d at 1144.  "The objective

inquiry requires courts to consider whether the government *actually 'puts'* the religious adherent

to the 'choice' of incurring a 'serious' penalty or 'engaging in conduct that seriously violates his

religious beliefs.'"  Id. (emphasis added) (quoting Holt, 135 S. Ct. at 862); see also Zubik v.

Burwell, 136 S. Ct. 1557 (2016) ("In determining whether a law or policy applies substantial

pressure on a claimant to violate his or her beliefs, we consider how the law or policy being

challenged *actually operates* and affects religious exercise." (emphasis added)); Little Sisters of

the Poor Home for the Aged v. Burwell, 794 F.3d 1151, 1177 (10th Cir. 2015); Hobby Lobby

Stores, Inc. v. Sebelius, 723 F.3d 1114, 1137 (10th Cir. 2013), *aff'd sub nom.* Hobby Lobby, 573

U.S. at 682 (finding the substantial burden test requires an inquiry into "the *intensity of the*

*coercion* applied by the government to act contrary to those beliefs" not "into the theological

merit of the belief in question" (emphasis in original)).

        In other words, courts must accept the claimant's religious exercise "as he understands

that exercise and the terms of his faith" but must also objectively determine whether the

governmental law or policy at issue *directly conflicts* with the religious conduct and, if so,

whether the pressure the law exerts is substantial.  Eternal Word, 818 F.3d at 1148; Davila, 777

F.3d at 1205; Yellowbear, 741 F.3d at 55; Sterling, 75 M.J. at 417–19 (suggesting courts

consider both the secular and religious costs the law imposes).  "[A] government practice which

offends religious sensibilities but does not force the claimant to act contrary to her beliefs does

not constitute a substantial burden."  Sterling, 75 M.J. at 417; see also Hobby Lobby, 573 U.S. at

725–26 (discussing case law where petitioners were "unable to identify any coercion directed at

the practice or exercise of their religious beliefs" (quoting Tilton v. Richardson, 403 U.S. 672,

689 (1971)); United States v. Friday, 525 F.3d 938, 947–48 (10th Cir. 2008) (finding a law

52

limiting "access to the eagle needed for [a religious] ceremony" is a substantial burden, but a law "requiring the adherent apply for a permit to get an eagle feather (futile or not) is not"); Kaemmerling, 553 F.3d at 678 (finding no substantial burden where the claimant could not "identify any 'exercise' which is the subject of the burden to which he objects"); Smith v. Allen, 502 F.3d 1255, 1278 (11th Cir. 2007) (no substantial burden where petitioner "failed to establish the relevance of the crystal to his practice of Odinism, as he was obligated to do in order to demonstrate that the denial of the item would significantly hamper his religious observance"); Guam v. Guerrero, 290 F.3d 1210, 1222 (9th Cir. 2002).

Where RFRA is used as a defense in a criminal case, courts have been reluctant to find that prosecution alone constitutes a substantial burden. Jeffs, 2016 WL 6745951, at *7 (noting that if prosecution alone sufficed, the substantial burden test would be rendered superfluous in all criminal cases involving RFRA claims); see, e.g., Kaemmerling, 553 F.3d at 679 ("Nor does the criminal penalty for 'failure to cooperate' . . . substantially burden [plaintiff's] exercise of religion."); Kiczenski v. Gonzales, 237 F. App'x 149, 151 (9th Cir. 2007); People v. Felix, No. ST-17-CR-203, 2018 WL 4469867, at *3 (V.I. Super. Sept. 11, 2018) ("[A] law regulating conduct that is substantially threatening to the public welfare cannot be a substantial burden on the free exercise of religion."); but see Guam, 290 F.3d at 1222 (finding a substantial burden is created when enforcement of a law "results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution." (quoting Braunfeld v. Brown, 366 U.S. 599, 605 (1961))). Indeed, if criminal sanctions automatically constitute a substantial burden

under RFRA, every criminal prosecution involving a sincere religious exercise would trigger strict scrutiny.  Jeffs, 2016 WL 6745951, at *7.[36]

At the very least, however, the objective component of the substantial burden test requires the criminal law directly conflict with the overall religious exercise.  See Eternal Word, 818 F.3d at 1149 (finding no substantial burden on religion when the law required religious adherents to affirmatively seek an accommodation in lieu of providing contraceptive coverage because women obtained contraceptive coverage "regardless of [the claimant's] action"); Sterling, 75 M.J. at 419–20 ("[A]n option to request an accommodation 'may eliminate burdens on religious exercise or reduce those burdens to de minimis acts of administrative compliance that are not substantial for RFRA purposes.'" (quoting Little Sisters of the Poor, 794 F.3d at 1178)); Guerrero, 290 F.3d at 1223 (affirming that a Rastafarian may use RFRA to defend against charges for marijuana possession but not charges for distribution); United States v. Bauer, 84 F.3d 1549, 1559 (9th Cir. 1996) (ordering a new trial for Rastafarians for marijuana possession charges but upholding convictions for conspiracy, distribution, and money laundering as nothing suggested Rastafarianism included such conduct); Hutson, 2018 WL 345316, at *5

---

[36]   Because the substantial-burden inquiry focuses on the coercion applied by the underlying law—rather than the prosecution itself—considerations such as conditions and restrictions of pretrial confinement and decisions by prosecutors to charge multiple counts are irrelevant to this portion of the RFRA analysis.  Rather, in cases like this one, the test is whether the governmental law or policy functions to directly force the claimant to choose between her religion and following the law.  Eternal Word, 818 F.3d at 1144 (11th Cir. 2016).  As long as the challenged law or policy "neither 'forces [religious claimants] to choose between practicing their religion and receiving a Government benefit nor coerces them into a Catch–22 situation: exercise of their religion under fear of civil or criminal sanction,' it does not impose a substantial burden under RFRA."  Ruiz-Diaz v. United States, 819 F. Supp. 2d 1154, 1159 (W.D. Wash. 2011) (quoting Snoqualmie Indian Tribe v. Fed. Energy Regulatory Comm'n, 545 F.3d 1207, 1214 (9th Cir. 2008)).  Accordingly, when the objective function of the law does not directly constrict the religious practice, any other deleterious effects would be merely incidental and inapplicable to the substantial burden analysis.  Ruiz-Diaz, 819 F. Supp. 2d at 1159 (finding that because the law at issue did not "coerce plaintiffs to act contrary to their religious beliefs or face civil or criminal sanctions . . . the fact that a regulation may ultimately interfere with plaintiffs' ability to practice their religion or serve their religious community is 'irrelevant' to the substantial burden analysis").

54

(finding no substantial burden in a prosecution for actions which did "not link[] to any religious belief or practice"); Wilson v. James, 139 F. Supp. 3d 410, 425 (D.D.C. 2015); Mahoney v. U.S. Marshals Serv., 454 F. Supp. 2d 21, 38 (D.D.C. 2006) (dismissing a RFRA claim when plaintiffs "d[id] not allege that their religion compels them to engage in [religious] speech at the time and place and in the manner at issue here").

Defendants argue that "the enforcement of the trespass and property statutes by means of criminal prosecution" impose a substantial burden. Doc. 245 at 18 n.25. The Court accepts that Defendants' sincerely held religious belief required they perform acts of "symbolic disarmament," and these beliefs required Defendants to engage in these acts of protest at the Kings Bay base. However, the evidence does not demonstrate that Defendants had a sincere religious belief that required them to engage in those activities without permission or on portions of the facility behind the perimeter fence line. Therefore, Defendants' religious beliefs are not in conflict with general laws prohibiting trespass, injury to government property, or conspiracy, and those laws do not impose a substantial burden on Defendants' religious beliefs. In other words, there is no substantial burden because Defendants could have exercised their religious beliefs without violating the laws under which they are charged.

First, nothing in Defendants' testimony indicates their religious beliefs prohibited them from asking permission to enter and perform their religious exercise on Kings Bay. The Government's witnesses explained that the base commander has authority to approve protests— religious or not—both inside and outside of the perimeter fencing, and that the base commander had, in fact, approved protests on base property in the past. Doc. 313 at 181–85, 189; Doc. 316 at 234.

Defendants did not testify that they were religiously prohibited from asking permission or that their religious beliefs would have been burdened by asking permission.[37]  In fact, Hennessy and Colville testified that they would be able to engage in symbolic disarmament on an area of the base set aside by base command.  Doc. 313 at 59, 95–96.  McAlister would give "prayerful consideration" to such an offer, and O'Neill agreed that his religion did not require he enter the site without permission, and testified that he found the idea of an approved protest "interesting[,]" and stated he "would want to hear more about it."  Id. at 142, 168.  Most importantly, in addressing the least restrictive means prong of the RFRA test, all Defendants argue that a less restrictive alternative to prosecution would be for the Government to provide Defendants space on the military base to practice their religious beliefs.  Doc. 335 at 13 (proposing "a policy and practice to permit religious exercises on the Kings Bay naval base under certain circumstances" as a least restrictive means); Doc. 336 at 14 (same); Doc. 337 at 13 (same); Doc. 338 at 13–14 (same); Doc. 339 at 14 (same); Doc. 341 at 14 (same); Doc. 342 at 14 (same).  Thus, Defendants plainly believe that they could have exercised their sincerely held religious belief through a Government-approved protest—they just decided not to ask. Defendants cannot both assert that their religion requires unauthorized entry and prohibits requests for permission *and* that the Government can accommodate Defendants' religious beliefs by providing Defendants space on the base to engage in symbolic disarmament.  Rather, implicit in Defendants' argument that permissive entry is a less restrictive alternative to prosecution is that entry with permission would comport with Defendants' religious views.  Defendants

---

[37]    During the evidentiary hearing, Defendants Kelly and Colville explained that illegally entering the facility without permission drew greater attention to the protest activities, which they viewed as favorable.  Doc. 245-4 at 7, 9; Doc. 313 at 92–94; Doc. 316 at 114–15, 125–26.  But these Defendants did not credibly testify that illegal entry was, in itself, a part of their religious belief system.

conceded that they did not ask permission because they believed such a request would be futile.[38]

Simply put, Defendants could have asked permission to protest on the Kings Bay facility but declined to do so without any religious motivation for doing so.

Even if Defendants were compelled by their sincerely held religious beliefs to protest on Kings Bay without permission—which they plainly were not—Defendants have not shown that their beliefs required them to cut locks and fences to enter the protected area of the base. Defendants could have engaged in symbolic disarmament (with or without permission) on the Kings Bay base, but at the Bancroft Memorial.  The evidence demonstrates that the Bancroft Memorial contains a static display of a decommissioned submarine.  Doc. 313 at 184; Doc. 316 at 233.  The Memorial is located on Kings Bay property, on the base but just outside of the perimeter fencing.  Doc. 313 at 182–87.  No permission is required for individuals to protest at the Memorial.  Id.  Nothing in Defendants' testimonies indicates that they could not have engaged in the same religious exercise at the Bancroft Memorial instead of behind the perimeter fencing.  The testimony shows that cutting fences, padlocks, and concertina wire are not acts of symbolic disarmament; rather, they are means of getting on the base to perform the acts of symbolic disarmament.  See, e.g., Doc. 313 at 90–91.  Because Defendants could have practiced symbolic disarmament at the Bancroft Memorial, there is no direct conflict between their

---

[38]      To be clear, Defendants did not establish that their request would have been futile, only that they anticipated it would be rejected.  At most, Defendants pointed to instances at other military installations where they had been removed or prohibited from protesting.  See, e.g., Doc. 313 at 132–33, 137 (discussing experiences of being rejected from entering military bases in the past (*testimony of Elizabeth McAlister*)); Doc. 316 at 151–52 (demonstrating defendants "anticipate[d]" rejection but suggesting that "perhaps [they] could have been persuasive in other ways that were not exhausted" (*testimony of Father Stephen Kelly*)); Doc. 316 at 197 (stating that no permission was sought because "past personal experience" provided "no reason to believe" the Government "would facilitate the nonviolent symbolic disarmament of the kind [Defendants] practice" (*testimony of Clare Grady*)).  This amounts to nothing more than conjecture that the Kings Bay base commander would have refused a request by these Defendants.

religious exercise and the criminal statutes under which they are charged, and thus, no substantial burden exists.

In sum, Defendants' sincerely held religious beliefs required them to protest on the Kings Bay facility but their religious beliefs, as Defendants articulated those beliefs, did not require the protest to occur without permission and behind the perimeter fence.  Because Defendants could have exercised their sincerely held religious beliefs without running afoul of criminal laws, the criminal laws giving rise to the charges in this case do not substantially burden Defendants' religious beliefs.

### D.    Compelling Interest

If the religious adherent makes a prima facie RFRA showing, the burden shifts to the Government to show the law at issue furthers a compelling interest and is the least restrictive means of doing so.  Though Defendants failed establish their prima facie case, the Court will nonetheless address the remainder of the RFRA analysis.

#### 1.    Standard for Evaluating the Government's Compelling Interest

Compelling interests relate to the "fundamental concerns of government: public health and safety, public peace and order, defense, [and] revenue[.]"  Yellowbear, 741 F.3d at 57.  In most cases, it is not sufficient for the government to merely demonstrate a compelling interest generally; the interest must be addressed with regard to the individual whose religious exercise is burdened.  Eternal Word, 818 F.3d at 1154.  RFRA's compelling interest test requires the government to consider religious exceptions to generally applicable rules and courts to "strike sensible balances" between the compelling interest and "the particular practice at issue."  O Centro, 546 U.S. at 421, 439.  Thus, courts must "look[] beyond broadly formulated interests" to scrutinize "the marginal interest in enforcing" the challenged governmental action and "the

asserted harm[s] of granting specific exemptions to particular religious claimants." Holt, 135 S.

Ct. at 863 (quoting Hobby Lobby, 573 U.S. at 726–27); O Centro, 546 U.S. at 439.

Despite RFRA's case-by-case approach, the Supreme Court left open the possibility that,

in some circumstances, the government may be able to provide evidence justifying that its

interest "in uniform application of a particular program" is so compelling that it forecloses the

possibility of any religious exemptions.  O Centro, 546 U.S. at 435 ("[T]here may be instances

where a need for uniformity precludes the recognition of exceptions to generally applicable laws

under RFRA . . . ."); Yellowbear, 741 F.3d at 62 ("The [Supreme] Court has recognized the

possibility that there may be cases where [a case-by-case] approach is inappropriate and the

"need for uniformity precludes the recognition" of any exceptions to anyone, or where a well-

documented slippery slope argument could support such a uniform rule."); see also United States

v. Epstein, 91 F. Supp.3d 573, 585 (D.N.J. 2015), aff'd sub nom. Stimler, 864 F.3d at 253

("[L]aws prohibiting kidnapping and conspiracy to commit crimes are laws for which the need

for uniform enforcement precludes the recognition of religious exception . . . ."); Martines, 903

F. Supp.2d at 1066 (finding the Government had a compelling interest in the universal

application of marijuana distribution laws).

When determining whether a religious exemption is required, unnecessary, or

categorically prohibited, "context matters." O Centro, 546 U.S. at 431; Cutter, 544 U.S. at 722.

For example, courts must give "due deference to the experience and expertise of prison and jail

administrators." Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 533 (11th Cir. 2013).  The

same is true in a military context.  Singh v. McHugh, 185 F. Supp. 3d 201, 218 (D.D.C. 2016)

("In enacting RFRA, Congress . . . noted its expectation that courts would adhere to the tradition

of judicial deference in matters involving both prisons and the armed forces."); see also Cutter,

544 U.S. at 722 ("We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety."); Ali, 682 F.3d at 711 (observing " a courtroom . . . is a special context in which special needs arise").  Deference does not mean "unquestioning acceptance," and government officials cannot simply "declare a compelling interest by fiat."  Holt, 135 S. Ct. at 864, 867 (Sotomayor, J., concurring) (quoting Yellowbear, 741 F.3d at 59).  Moreover, regardless of the amount of deference afforded, "policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the act's requirements."  Davila, 777 F.3d at 1206 (quoting Rich, 716 F.3d at 533).  Courts may, however, defer to the expertise of military or prison officials who offer "plausible explanation[s] for their chosen policy" which are supported by reasonably available evidence.  Holt, 135 S. Ct. at 867 (Sotomayor, J., concurring).

2.    *The Government's Stated Compelling Interests in this Case*

The Government, in its pleadings and at the evidentiary hearing, asserts five compelling interests: (1) protecting Naval Submarine Base Kings Bay against entry from unauthorized persons, doc. 190 at 7–8, doc. 214 at 2; doc. 227 at 11–12; doc. 340 at 5; (2) ensuring the security of military bases and personnel, doc. 227 at 11–12; doc. 340 at 5; (3) protecting government property, doc. 227 at 11–12; (4) protecting the community from crime, doc. 227 at 11; and (5) prosecuting recidivists, doc. 340 at 6.  Here, the examination focuses on the existence and enforcement of the criminal statutes (namely, conspiracy, trespass, and laws prohibiting destruction of property) under which Defendants are now being prosecuted and whether those laws serve the stated compelling interests.

At least three of the Government's stated interests are plainly compelling.[39]  First, it is well established that the protection of government property is a compelling and "fundamental" interest.  Allen, 760 F.2d at 452–53 (finding that "protecting government property, especially the supply of nuclear weapons, is essential to public peace, order, and safety" and that a "more fundamental interest does not readily come to mind").  Defendants have demonstrated their willingness and ability to enter restricted government property and to deface property located in those areas.  Thus, both generally and as applied to these Defendants, the Government has demonstrated a compelling interest in protecting its property.[40]  Second, the Government has demonstrated a compelling interest in adopting laws to protect against unauthorized access to sensitive military areas by these Defendants—individuals who have no security clearances, no base-provided supervision, and who have expressed their desire to impact the military and national security operations at the Kings Bay facility.  The Government has demonstrated a compelling interest in prohibiting unauthorized entry by these Defendants.

Finally, the Government has shown it has a compelling interest in ensuring the security—and, therefore, the safety—of the base and its personnel from the dangers created by the actions

---

[39]     While protecting the community from crime and prosecuting recidivists may be compelling, these two interests do not appear distinct from the others and are likely subsumed by the first three interests asserted.  Regardless, one compelling interest is enough.  See Gibson v. Babbitt, 223 F.3d 1256, 1258 (11th Cir. 2000) (declining to address additional proposed compelling interests after determining the government met its burden as to one compelling interest).

[40]     The circumstances of this case—clandestine, nighttime entry and property destruction at a military base that serves a critical role in national security—present one of the rare instances where the Government may properly assert a general, as opposed to "as-applied," compelling interest.  Gonzales, 546 U.S. 418 at 436 ("We do not doubt that there may be instances in which a need for uniformity precludes the recognition of exceptions to generally applicable laws under RFRA."); Yellowbear, 741 F.3d at 62; Adams v. Comm'r, 170 F.3d 173, 179 (3d Cir. 1999) ("The least restrictive means of furthering a compelling interest in the collection of taxes—a compelling interest that [plaintiff] has conceded—is in fact, to implement that system in a uniform, mandatory way . . . .").  Given the evidence of record attesting to the importance of the property at stake in this case, I find that the Government has shown its interest in this regard is a compelling one, generally and as applied.

of these Defendants.  The Government established that the Ohio-class submarines are more

vulnerable to attack when docked at the base than when deployed, and that the Kings Bay facility

utilizes extraordinary security measures, including the use of deadly force, to ensure the security

of the base.  By entering the base and its most sensitive areas without authorization, Defendants

put themselves and base personnel at risk (e.g., the exercise of deadly force could have easily

resulted in casualties among Defendants or those charged with base security).  Thus, the

Government has easily established that it has a compelling interest in adopting and applying

property and trespass laws that prohibit the unauthorized entry into the base and destruction of

base property by Defendants.

> **E.    Least Restrictive Means**

Next, the Government must show the challenged law is the least restrictive means of

serving its compelling interest.  Friday, 525 F.3d at 946; see also Holt, 135 S. Ct. at 864 (holding

that the government must "sho[w] that it lacks other means of achieving its desired goal without

imposing a substantial burden on the exercise of religion by the objecting part[y]." (quoting

Hobby Lobby, 573 U.S. at 728)).  Defendants argue there are many other, less restrictive

methods the Government could employ and that the Government has failed to respond to

alternatives posed by the group as a whole and Defendants individually.  Doc. 335 at 13.  Over

the course of the pre-trial proceedings and pleadings, Defendants have suggested the following

less restrictive means: (1) prosecuting, but reducing the number or severity of charges; (2) not

prosecuting, but instead offering (a) civil injunctions against future trespass, (b) civil damages or

community service, (c) "ban and bar" letters, or (d) pre-trial diversion; and (3) giving Defendants

permission to practice symbolic disarmament on Kings Bay by creating a special

accommodation.  Doc. 221 at 25–26; Doc. 245 at 34–35; Doc. 316 at 25; Doc. 335 at 13; Doc. 336 at 14; Doc. 337 at 13; Doc. 338 at 13–14; Doc. 339 at 14; Doc. 341 at 14; Doc. 342 at 14.

Courts "must not assume a plausible, less restrictive alternative would be ineffective." Holt, 135 S. Ct. at 866.  Rather, "[i]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." Holt, 135 S. Ct. at 864 (quoting United States v. Playboy Ent't Grp., 529 U.S. 803 (2000)).  "[T]he government's burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record." Wilgus, 638 F.3d at 1289.  In doing so, the government need not respond to every conceivable alternative—such a task would be impossible—nor must it demonstrate it considered less restrictive alternatives at any specific point in time. Holt, 135 S. Ct. at 868 (Sotomayor, J., concurring); Wilgus, 638 F.3d at 1289.  Rather, the government "must address those alternatives of which it has become aware during the course of this litigation." Christie, 825 F.3d at 1061; see also Wilgus, 638 F.3d at 1289.

The determination of whether less restrictive methods of furthering the Government's compelling interest exist is, at heart, a question of balancing the interest against the religious exercise. See, e.g., Christie, 825 F.3d at 1059 ("As its name implies, the 'least restrictive means' test calls for a comparative analysis.").  Important to this case, the suggested alternatives must actually accommodate the religious views. Hobby Lobby, 573 U.S. at 731 n.40 (explaining that to qualify as a less restrictive means, a proposed alternative must "accommodate[] the religious beliefs asserted in these cases").  RFRA contemplates that exceptions to government programs can be made and allows for exceptions which require time, labor, and cost expenditures. New Doe Child #1, 891 F.3d 578, 585 (6th Cir. 2018) ("[C]ourts may craft exceptions to statutory

63

government programs to accommodate religious beliefs, but the Government may resist such accommodations with 'evidence' that they would 'seriously compromise its ability to administer the program.'" (quoting O Centro, 546 U.S. 418, 435 (2006))).  However, RFRA cannot be used to force the government to change its national policies to "comport with the religious beliefs of particular citizens."  Moore-Backman v. United States, No. CV 09-397, 2010 WL 3342173, at *6 (D. Ariz. June 28, 2010) (quoting Bowen v. Roy, 476 U.S. 693, 699 (1986)); see Hobby Lobby, 573 U.S. at 730–31; Yellowbear, 741 F.3d at 62.

Here, I find the Government has shown "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.'"  See Holt, 135 S. Ct. at 864; Hobby Lobby, 573 U.S. at 728.  There is no "proffered alternative scheme" which would "be less restrictive while still satisfactorily advancing the compelling government interests."  Wilgus, 638 F.3d at 1289.  First, the majority of Defendants' suggested alternatives (such as forgoing prosecution, pre-trial diversion, or imposing only civil injunctions, fines, or ban and bar letters) reflect less *punitive*—but equally *restrictive*—government accommodations.  Christie, 825 F.3d at 1062.  All of those options still "trigger an outright ban" on Defendants' ability to practice their prophetic and sacramental acts on United States military bases.  Id.  Defendants would still be prohibited from engaging in symbolic disarmament under these proposed alternatives.  The difference is only that the penalties for such engagement would be less severe.  Moreover, this Court agrees that parsing the specific charges brought against Defendants, rather than just the choice to prosecute, "plunge[s] courts far too deep into the business of reviewing the most basic exercises of prosecutorial discretion."  Id.  Defendants' proposed alternatives are not actually less restrictive means because they do not "actually accommodate the religious view."  Hobby Lobby, 573 U.S. at 731 n.40.

Defendants propose only one alternative which seemingly accommodates their religious exercise: a permitted protest on the naval base.  As explained above, the Kings Bay base commander does permit some protests at the naval base, but Defendants never requested permission (not for religious reasons, but because they believed the request would be denied). Moreover, protests can occur on base property at the Bancroft Memorial, even without permission.  Defendants, however, elected to enter a secured area of the base without permission under the cover of night.  Defendants cannot plausibly suggest that a permitted protest is a less restrictive means of protecting the Government's compelling interests when Defendants made no effort to determine whether the less restrictive means they now propose was available to them before they broke into the base.  To permit such tactics would turn the RFRA analysis on its head.  Thus, I find that the Government has shown that the trespass and property laws, and prosecution thereunder, is the least restrictive means of furthering its compelling interests.

In conclusion, though Defendants sincerely believed their religion required them to perform symbolic nuclear disarmament on Kings Bay, they fail to show they were religiously required to perform that exercise without permission behind the perimeter fencing.  Thus, the statutes under which Defendants are charged do not directly put Defendants in a choice to break the law or abstain from their religiously required practice.  In absence of a conflict between Defendants' religious beliefs and the laws they challenge, no substantial burden exists. Moreover, even assuming Defendants could meet their prima facie case, the Government has shown that any substantial burden on Defendants would be outweighed by several compelling interests, both generally and as applied to these Defendants, and that it lacks any less restrictive means of meeting its goals.  I, therefore, **RECOMMEND** the Court **DENY** Defendants' Motions to Dismiss as to the RFRA defense.

III.     **Selective or Vindictive Prosecution**

Defendants argue the indictment should be dismissed because the Government is selectively prosecuting Defendants for "taking actions to object to war crimes" while refusing to prosecute those who, through their support of nuclear weapons, committed "war crimes."  Doc. 87 at 1, Doc. 88 at 27–28; Doc. 221 at 19–22, 38.  In response, the Government asserts that this argument must fail because Defendants cannot point to a similarly situated individual who was not prosecuted.  Doc. 190 at 3–5; Doc. 221 at 63–64.

The government's prosecutorial decisions are afforded broad deference by courts, but this discretion, though vast, is curtailed by some constitutional constraints.  United States v. Brantley, 803 F.3d 1265, 1271–72 (11th Cir. 2015); United States v. Smith, 231 F.3d 800, 807 (11th Cir. 2000)) ("The judiciary cannot interfere with a prosecutor's exercise of charging discretion, except in narrow circumstances where it is necessary to do so in order to discharge the judicial function of interpreting and applying the Constitution.").  A selective prosecution defense does not attack the "merits to the criminal charge itself" but functions as "an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  Smith, 231 F.3d at 807–08 (quoting United States v. Armstrong, 517 U.S. 456, 464 (1996)).  Under the Fifth Amendment's Due Process Clause, "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification."  United States v. Jordan, 635 F.3d 1181, 1188 (11th Cir. 2011) (quoting Smith, 231 F.3d at 807).  A defendant who asserts a selective prosecution defense assumes a "demanding" burden.  Id.  "A defendant asserting that she was selectively prosecuted must show 'that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose.'"  Brantley, 803

F.3d at 1271 (quoting <u>Jordan</u>, 635 F.3d at 1188); <u>United States v. Walli</u> (<u>Walli I</u>), No. 3:12-cr-107, 2013 WL 1838159, at *6–8 (E.D. Tenn. Apr. 30, 2013).

To show a discriminatory purpose, the defense must show that "the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." <u>Id.</u> at 1271 (quoting <u>Jordan</u>, 635 F.3d at 1188). Secondly, and more relevant to the purposes of this Court's disposition of this issue, the fulfillment of the discriminatory effect prong requires the defense demonstrate that "similarly situated individuals were not prosecuted." <u>Id.</u> at 1271–72. For selective prosecution purposes, a "similarly situated" individual is someone "who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant[.]" <u>Jordan</u>, 635 F.3d at 1188. The "comparator" must be similar in "all relevant respects," and the evidence against that person must be "as strong or stronger than that against the defendant" asserting the selective prosecution defense. <u>Brantley</u>, 803 F.3d at 1271–72; <u>Jordan</u>, 635 F.3d at 1188. This ensures that the government would achieve the same deterrence value in prosecuting the comparator and thus allows the Court to make a comparative assessment about the government's different treatment of the defendant and comparator. <u>Jordan</u>, 635 F.3d at 1188.

Defendants identify current United States President Donald Trump as their comparator, arguing that contrasting treatment shows the Government "decline[s] to prosecute war crimes involving the threat of nuclear weapons" and instead only levies charges against those who "take actions to object to war crimes." Doc. 88 at 27; Doc. 221 at 20–22. Defendants point to various comments made by the current President, including a 2018 tweet stating that he had a "much bigger" and "more powerful" nuclear weapons than North Korea. Doc. 88 at 27.

Defendants fail to show that President Trump is a similarly situated comparator. Regardless of the merits of Defendants' claim that the the President has committed war crimes, Defendants' argument simply does not comport with the legal standard for selective prosecution. First, a person accused of a war crime and a person accused of a crime premised on a moral objection to war are not similar in any relevant respect because they have not committed the same basic offense in substantially the same manner. Furthermore, it is obvious that the Government would employ a completely different analysis in determining whether to prosecute private individuals who have engaged in allegedly unlawful protest activities as opposed to an elected official accused of committing a war crime. Because Defendants fail to point to any similarly situated comparator, their selective prosecution defense fails. I, therefore, decline to consider the discriminatory purpose prong and **RECOMMEND** the Court **DENY** Defendants' Motions to Dismiss based on selective prosecution.[41]

## IV.    Duplicitous or Multiplicitous Counts

Defendants argue Counts One, Two, and Three should be dismissed because the charges are duplicitous and multiplicitous. Doc. 221 at 30. Defendants are charged with violating four different Code sections, though all four counts arise from one course of conduct. Count One charges Defendants with conspiracy, in violation of 18 U.S.C § 371. Doc. 1 at 1–4. Count Two

---

[41]    In their Motions to Dismiss, Defendants also request discovery on the selective prosecution defense. Doc. 88 at 28. However, "to obtain discovery on a selective-prosecution claim, a defendant must satisfy a 'rigorous standard.'" United States v. Khan, No. 1:17-CR-40, 2017 WL 9605112, at *3 (N.D. Ga. Sept. 5, 2017) (quoting Armstrong, 517 U.S. at 468); see also Armstrong, 517 U.S. at 468 ("The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim . . . ."). To be entitled to discovery, Defendants must "provide 'some evidence tending to show the existence of the essential elements of the defense.'" Jordan, 635 F.3d at 1188 (quoting Armstrong, 517 U.S. at 468). Because the evidence offered as to discriminatory effect does not begin to "show the existence" of an "essential element[] of the defense," Defendants' request for discovery on this issue is **DENIED**.

charges felony destruction of property on a naval installation, in violation of 18 U.S.C. § 1363. Id. at 5.  Count Three is a felony charge for depredation of government property, in violation of 18 U.S.C. § 1361.[42]  Id. at 6.  Count Four, which is not challenged as duplicative or multiplicative in this argument, is a misdemeanor violation for trespass on military, naval, or coast guard property under § 1382.  Id. at 7.

An indictment is "duplicitous" when two or more distinct offenses are charged together in a single count.  In re Gomez, 830 F.3d 1225, 1227 (11th Cir. 2016).  Defendants argue that Count One—conspiracy in violation of § 371—is duplicitous because, in defining the object of the conspiracy, the indictment explicitly references violations of § 1363, § 1361, and § 1382 (Counts Two, Three, and Four, respectively).  Doc. 123 at 27–28.  However, this argument is foreclosed by Braverman v. United States, 317 U.S. 49, 54 (1942).  In Braverman, the Supreme Court held that an "allegation in a single count of a conspiracy to commit several crimes is not duplicitous" because the conspiracy is only a single offense, no matter how diverse its objects. Id.  Although Defendants argue that multiple conspiracies have been charged, Count One alleges but one "single continuing agreement" (the conspiracy) with multiple criminal ends (the other three counts).[43]  Doc. 1 at 1–4.  Thus, the duplicity argument fails.

---

[42]   A violation of § 1361 may be a misdemeanor or a felony, dependent on the amount of damage to the depredated property.  § 1361.  Defendants are charged with the felony version of this statute.  Doc. 1 at 6.

[43]   Though the statutory language of § 1363 encompasses anyone who "attempts or conspires" to "destroy[] or injure[] any structure, conveyance, or other real or personal property" located "within the special maritime and territorial jurisdiction of the United States," Count Two of the indictment only charges Defendants with "attempt[ing] to destroy and injure" such a structure, and omits the conspiracy element entirely.  Doc. 1 at 5; see also United States v. Goldberg, 913 F. Supp. 629, 632 (D. Mass. 1996) (noting, for determining duplicity, courts should adopt a "[n]arrow[] the view of the statute to the sections cited in the indictment" and that "a separate problem entirely [from duplicity] is raised if the jury is instructed that it may convict the defendant for some offense not charged . . . in the indictment").

Regarding Defendants' multiplicity argument, an indictment is multiplicitous when it charges "a single offense in more than one count." Ward v. United States, 694 F.2d 654, 660 (11th Cir. 1983). A multiplicitous indictment "confuses the jury by suggesting that not one but several crimes have been committed," and thus "violates the principles of double jeopardy" by "giv[ing] the jury numerous opportunities to convict the defendant for the same offense." United States v. Williams, 527 F.3d 1235, 1241 (11th Cir. 2008) (quoting United States v. Hearod, 499 F.2d 1003, 1005 (5th Cir. 1974)). The "principal danger" is that "the defendant may receive multiple sentences for a single offense." United States v. Langford, 946 F.2d 798 (11th Cir. 1991).

In Blockburger v. United States, the Supreme Court laid out the test to determine whether an indictment contains multiplicitous counts. 284 U.S. 299, 302 (1932); see also United States v. Davis, 854 F.3d 1276, 1290 (11th Cir. 2017). The Blockburger test is "one of statutory interpretation" focused on "whether Congress intended to authorize cumulative punishments." Davis, 854 F.3d at 1286 (citing Williams, 527 F.3d at 1241). "If the same conduct violates two statutory provisions, courts must first determine whether the legislature intended each violation to be a separate offense, with separate punishments." United States v. Boles, 666 F. App'x 805, 808 (11th Cir. 2016). When "there is no clear indication of legislative intent to impose cumulative punishments," the next step is to apply the Blockburger test.[44] Williams v. Singletary, 78 F.3d 1510, 1513 (11th Cir. 1996).

---

[44]     All four counts also allege a violation under 18 U.S.C. § 2. Doc. 1 at 4–7. Section 2 provides that anyone "who 'aids, abets, counsels, commands, induces or procures' the commission of an offense . . . is punishable as a principal." United States v. Hassoun, 476 F.3d 1181, 1184 n.2 (11th Cir. 2007) (quoting 18 U.S.C. § 2); see also United States v. Ibarguen-Mosquera, 634 F.3d 1370, 1383 (11th Cir. 2011). However, "the indictment's explicit reference to § 2 does not alter the analysis under Blockburger" because proof of "criminal liability on an aiding-and-abetting theory requires no less than

Under the <u>Blockburger</u> test, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." <u>Blockburger</u>, 284 U.S. at 304 ("A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other."); <u>Williams</u>, 527 F.3d at 1241; <u>United States v. Anderson</u>, 872 F.2d 1508, 1520 (11th Cir. 1989).  Thus, as long as each charge in an indictment "requires proof of an additional fact which the other does not," the indictment does not violate double jeopardy.  <u>Ward</u>, 694 F.2d at 661; <u>see</u> <u>United States v. Wahchumwah</u>, 710 F.3d 862, 869 (9th Cir. 2013) (noting that <u>Blockburger</u> requires that 'Count One' contains proof of a fact 'Count Two' does not *and* that 'Count Two' requires proof of a fact 'Count One' does not); <u>United States v. Woods</u>, 684 F.3d 1045, 1060 (11th Cir. 2012) ("[C]harges in an indictment are not multiplicitous if the charges differ by even a single element or alleged fact.").  "If each offense requires proof of a fact that the other does not, the <u>Blockburger</u> test is satisfied despite any overlap in the proof necessary to establish the crimes." <u>United States v. Moore</u>, 43 F.3d 568, 571 (11th Cir. 1994).  "Importantly, the <u>Blockburger</u> analysis . . . 'focus[es] on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial.'" <u>United States v. Gonzalez</u>, 834 F.3d 1206, 1219 (11th Cir. 2016) (quoting <u>Illinois v. Vitale</u>, 447 U.S. 410, 416 (1980)).

---

the proof required for the principal offense itself." <u>Hassoun</u>, 476 F.3d at 1184 n.2 ("A defendant can only be liable on an aiding-and-abetting theory if the Government proves that the substantive offense . . . was *actually committed* by someone else." (emphasis in original)).

The first step of the inquiry requires the Court to determine whether Congress intended each violation to be a separate offense. The parties have not addressed in the briefs whether Congress intended to authorize cumulative punishments when enacting § 371, § 1363, or § 1361. Outside of the fact that Congress created three distinct statutory offenses and enumerated them in different Code sections, the legislative histories of the statutes do not contain any obvious indicators as to Congressional intent about cumulative punishments. In absence of either argument or clear intent, the Court will proceed to the next step—applying the Blockburger test. See United States v. Bobb, 577 F.3d 1366, 1371–72 (11th Cir. 2009); United States v. Kaiser, 893 F.2d 1300, 1304 (11th Cir. 1990).

Considering the proof requirements of Counts One, Two, and Three, it is clear that each count "requires proof of an additional fact which the other does not," and, therefore, the three counts are not multiplicitous. In order to convict Defendants under Count One for Conspiracy (in violation of § 371), the Government must prove: "(1) an agreement by two or more individuals to commit an offense against or defraud the United States; (2) knowing and voluntary participation; and (3) an overt act by a conspirator." Gonzalez, 834 F.3d at 1219. To convict under Count Two (in violation of § 1363), the Government must prove Defendants: (1) willfully and maliciously; (2) destroyed or injured (or attempted to destroy or injure); (3) any structure, conveyance, or other real or personal property; (4) located within the special maritime and territorial jurisdiction of the United States. See United States v. Al-Imam, No. 17-CR-213, 2019 WL 1204882, at *13 (D.D.C. Mar. 14, 2019); United States v. Khatallah, 316 F. Supp. 3d 207, 213 (D.D.C. 2018). To convict Defendants of Count Three (in violation of § 1361), the Government must prove Defendants: (1) willfully; (2) injured and committed a depredation; (3) against United States property; (4) which resulted in over $1,000 dollars of damage. See United

States v. Brown, 517 F. App'x 657, 660 (11th Cir. 2013); United States v. Liteky, 973 F.2d 910, 910 (11th Cir. 1992), United States v. Bangert, 645 F.2d 1297, 1307 (8th Cir. 1981).

First, Count One (the conspiracy charge under § 371) is plainly distinct from Count Two and Count Three.  To convict Defendants under § 371, the Government must prove an agreement existed, an element which is not required under Counts Two and Three.  See United States v. Benner, 442 F. App'x 417, 421 (11th Cir. 2011); Hassoun, 476 F.3d at 1187–88.  Additionally, both Counts Two and Three require injury to some type of property, which is not required under Count One.  Thus, Count One is not multiplicitous as compared to Count Two or Count Three.

Next, Defendants argue that Count Two (§ 1363) and Count Three (§ 1361) are multiplicitous because both counts criminalize the destruction of property and both require the Government prove the injury or attempted injury to property occurred on Kings Bay.  Doc. 221 at 30–31.  Defendants are incorrect.  Count Two (§ 1363) requires proof that the injury to property occurred "within the special maritime and territorial jurisdiction of the United States." United States v. White, 597 F. Supp. 2d 1269, 1274 (M.D. Ala. 2009).  Count Three (§ 1361), on the other hand, requires proof that the property injured belonged to the United States.  United States v. Krause, 914 F.3d 1122, 1127 (8th Cir. 2019) ("[T]he property must belong to the United States for a person to be guilty of" violating § 1361); United States v. Temple, No. 5:17-cr-50062 (D.S.D. Apr. 6, 2018), ECF No. 35, p. 5 ("The government cannot charge defendant with degrading government land under 18 U.S.C. § 1361 when the land in question does not, in fact, belong to the government."); Brodhead, 714 F. Supp. at 599 ("The fact that the Navy 'exercised dominion and control over [the depredated property] and that [the depredated property] had been subject to the practical usage of the Government,' is sufficient to establish a property right for purposes of 18 U.S.C. § 1361." (quoting United States v. McCalvin, 608 F.2d

1167, 1170 (8th Cir. 1979))).  In other words, § 1363 has a "location" requirement while § 1361

requires proof of government possession or ownership.[45]

      Cases applying these two statutes demonstrate that the requisite proof is different for each

offense.  For example, destruction of government property that is not located in the special

maritime and territorial jurisdiction of the United States can violate § 1361, even if it would not

violate § 1363.  Temple, No. 5:17-cr-50062 (D.S.D. Apr. 6, 2018), ECF 35, p. 9 ("Section 1361

is a statute of general applicability because the situs of the offense is not an essential element.");

United States v. Walli (Walli II), 3:12-cr-107 (E.D. Tenn. May 1, 2013), ECF Nos. 123, 133

(dismissing the § 1363 charge in an indictment that also charged a § 1361 violation when the

government "determined it [was] unable to establish jurisdiction" as to the § 1363 charge).

Similarly, a person could violate § 1363 by destroying private property located on federal land,

even if the property is not owned by the government.[46]  Thus, the elements necessary to sustain a

conviction under § 1361 are not identical to those necessary to convict under § 1363.

      Importantly, "double jeopardy is not implicated simply because a factual situation might

exist where a defendant could commit one act that satisfies the elements of two distinct

---

[45]     Although the location and ownership requirements of these two statutory provisions are sometimes considered "jurisdictional" elements, such elements are appropriately considered in the Blockburger test, particularly where the elements must be proven beyond a reasonable doubt, as required for these elements.  See Williams, 527 F.3d at 1241 (finding that two counts passed the Blockburger test when one required proof of "the use of wires in interstate commerce" and the other did not).  United States v. Hairston, 64 F.3d 491, 496 (9th Cir. 1995) (finding jurisdictional elements have "substantive weight" when applying Blockburger, and approving convictions under both § 2111 and § 2114 because § 2114 "requires proof that the money taken belonged to the United States" while § 2111 "requires proof that the robbery occurred on United States territory"); United States v. Andrews, 2 F. Supp. 3d 847, 852 (N.D.W. Va. 2014).

[46]     While some authority suggests the Government must exercise a degree of possession or control over the destroyed property for a conviction under § 1363, it is not required that the Government own that property, as is required under § 1361.  See, e.g., Khatallah, 316 F. Supp. 3d at 218.

offenses." <u>Hassoun</u>, 476 F.3d at 1188–89.  Rather, the question is "whether the defendant's one act must *necessarily* satisfy the elements of both offenses."  <u>Id.</u> (emphasis in original).  If "a scenario exist[s] where the hypothetical defendant might violate one section without violating the other[,]" then the indictment is constitutional.  <u>Id.</u>  Although circumstances might exist where the underlying proof required under § 1363 and § 1361 would be identical—and this case may be one of those circumstances—proof under one statute does not *necessarily* satisfy the elements of the other.  See <u>United States v. Manafort</u>, 313 F. Supp. 3d 311, 315 (D.D.C. 2018) (noting that the <u>Blockburger</u> "does not turn on whether the proof satisfying one charge can satisfy the other, but whether proof of one of *necessarily* includes proof of the other" (emphasis in original) (quotations omitted)).  For purposes of <u>Blockburger</u>, the proof required under § 1361 is not necessarily the same as the proof required under § 1363.  Therefore, Counts Two and Three are not multiplicitous.

For the reasons stated above, I **RECOMMEND** the Court **DENY** Defendants' Motions to Dismiss based on duplicity and multiplicity.

## V.   Failure to State an Offense Under International and Domestic Law

Defendants argue that the indictment fails to state an offense because nuclear weapons are weapons of mass destruction and the continuing possession, maintenance, and development of these weapons violates both domestic and international law.  Doc. 88 at 10–22; Doc. 221 at 9–19.  Defendants contend that, because nuclear weapons are incapable of targeted use and threaten the lives of citizens and noncombatants, the weapons are prohibited by international and domestic law, and the continuing threat of their use is a war crime.  Doc. 88 at 10–22; Doc. 221 at 9–19.  In addition, Defendants argue that "property which protects war crimes is not entitled to

legal protection." Doc. 88 at 20–23; Doc. 221 at 17–19. Thus, Defendants argue they "cannot be prosecuted for taking action to prevent a war crime." Doc. 88 at 16, 20.

Over the last 30 years, the Plowshares Movement has provided courts with many opportunities to address variations of this international law argument and the challenges to property classifications which Defendants raise here. Courts which have considered similar arguments, including the Eleventh Circuit, have uniformly rejected them. United States v. Montgomery, 772 F.2d 733, 737 (11th Cir. 1985) (rejecting an international law defense); Brodhead, 714 F. Supp. at 597 ("Federal courts that have considered the availability of this [international law] defense in the nuclear protest context have uniformly rejected it."); see also United States v. Platte, 401 F.3d 1176, 1185–86 (10th Cir. 2005) (rejecting a mistake of law argument when defendants argued that their actions were legally justified because "the operations at the missile site violated treaties and other international law"); United States v. Urfer, 287 F.3d 663, 667 (7th Cir. 2002) ("Even if it were contrary to international law for a nation to possess nuclear weapons, domestic law could properly and does make it a crime 'to correct a violation of international law by destroying government property.'" (quotation omitted)); United States v. Maxwell, 254 F.3d 21, 30 (1st Cir. 2001) ("In our view, an individual cannot assert a privilege to disregard domestic law in order to escape liability under international law unless domestic law forces that person to violate international law."); United States v. Komisaruk, 885 F.2d 490, 497 (9th Cir. 1989) ("[Defendant] contended that the illegality of the Navstar system under principles of international law stripped the computer of its status as property of the United States. The district court properly rejected this fanciful argument."); Kabat I, 797 F.2d at 590 (finding that because "failure to object to [international law violations] does not make one complicit . . . persons such as the defendants here are in no danger of sanction

under international law and can claim no privilege to violate domestic law"); <u>Allen</u>, 760 F.2d at

453 (denying an international law argument when defendants' "purpose may have been to

uphold international law" but "their action[s] disobeyed the wholly independent federal law

protecting government property"); <u>United States v. May</u>, 622 F.2d 1000, 1009 (9th Cir. 1980)

(rejecting an international law defense and noting that defendants "can assert no harm to

themselves from the allegedly illegal conduct of the government that is greater than, or different

from, the potential harm that might affect every other person in the United States"); <u>Walli I</u>, 2013

WL 1838159, at *2 (holding that "defendants' motion to dismiss on the basis of international law

fails because even assuming nuclear weapons are unlawful under international law, the

government may still criminalize the destruction of property on which the government carries

out its nuclear weapons program"); <u>United States v. Kabat</u> (<u>Kabat II</u>), No. 1:06-CR-59, 2006 WL

2583314, at *1 (D.N.D. Sept. 5, 2006) ("[T]he laws of the United States do not support the

theory that an individual has a right or a responsibility to correct a perceived violation of

international law/humanitarian law/tribal law/religious law by willfully destroying government

property."); <u>United States v. Katzberg</u>, 201 F.R.D. 50, 53 (D.R.I. 2001) (declining to address a

similar argument because such "allegations of violations of international law involve political

questions, and have no relevance to the offense charged").  Defendants' attempts to re-urge those

arguments here are rejected for the same reasons laid out in these numerous cases.

 In addition to the previously rejected arguments in the cases cited above, Defendants

argue that the possession and development of nuclear weapons is also in violation of domestic

law.  Doc. 221 at 8.  In support of this argument, Defendants cite to Captain Thomas Rogers's

declaration, doc. 89-2, as well as various military operations manuals incorporating provisions of

the Geneva Conventions, and 18 U.S.C. § 2441, which defines war crimes to include "grave

breach[es]" of the Geneva Conventions and conduct prohibited by certain parts of the Hauge

Convention.  § 2441(c); Doc. 88 at 10–22; Doc. 221 at 9–19.

      Though this argument is a newer development in Plowshares case law, at least two courts

have already addressed some form of it.  See United States v. Kelly, 676 F.3d 912 (9th Cir.

2012); Walli I, 2013 WL 1838159.  However, Defendants argue that the Kelly court "did not

address the domestic part of the illegality of nuclear weapons"—specifically, that the court failed

to consider the application of the various military commanders' handbooks and § 2441.  Doc.

221 at 13–15.  Regardless, it does not appear that Congress, in referencing these treaties, has

created (or intended to create) a situation where § 2441 would conflict with the enforcement of

the criminal statutes charged here.  See § 2441; Kelly, 676 F.3d at 914–15 (noting that a "natural

reading" of the Hague Convention shows it only "prohibits the *use* of certain weapons in 'armed

conflicts with nations'" (emphasis in original)).  Rather, Defendants' argument still fails because

§ 2441 is not in direct conflict with the statutes under which Defendants are being prosecuted.

Walli I, 2013 WL 1838159, at *7 n.7 ("[E]ven assuming the government has violated section

2441 by maintaining a nuclear weapons program, there is no reason why that violation gave the

defendants free license to violate other, distinct portions of the criminal code.").  This is because

§ 2441 prevents participation in war crimes but, by its plain language, does not punish acts of

omission like, for example, civilian failure to take affirmative action to destroy nuclear weapons.

Id. at *7 (noting that "defendants' theory amounts to the creation of a self-help remedy for

citizens who think that their government is violating international law" but "no such remedy

exists"); cf. Kabat I, 797 F.2d at 583; Montgomery, 772 F.2d at 737.

      Rather, to decide that § 2441 and other domestic law forces Defendants to choose

between committing war crimes and breaking into military bases to protest would be to decide

that every single person in the United States—other than these seven Defendants and similarly situated activists—is potentially guilty of a war crime. Defendants cite no authority for this far-fetched theory. Though someone who is placed in direct conflict by two competing criminal statutes would have a defense as to why she had to break one of the two laws, the laws here do not create that type of conflict. Thus, I **RECOMMEND** the Court **DENY** the portions of Defendants' Motions to Dismiss as they relate to the failure to state an offense argument.

## CONCLUSION

For the reasons stated above, I **RECOMMEND** the Court **DENY** Defendants' Motions to Dismiss. Docs. 87, 102, 118, 122, 141, 158, 171.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections within **30 days** of the date on which this Report and Recommendation is entered.[47] Doc. 408. Any objections asserting that the Magistrate Judge failed to address any contention must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions of the Magistrate Judge. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all counsel and non-represented parties to this action.

Upon receipt of Objections meeting the specificity requirement set out above, a United States District Judge will make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in

---

[47] During a hearing in this action on April 24, 2019, the Court granted an oral motion to extend the time period for objections to this Report and Recommendation to 30 days instead of the usual 14. Doc. 408. Defendants moved for the extension without objection from the Government. Id. In granting this extension, the Court **FINDS**, based on the voluminous record and the complexity of the issues in this case, that the ends of justice in allowing more time for Objections outweigh the best interest of the public and Defendants in a speedy trial.

whole or in part, the findings or recommendations made by the Magistrate Judge.  Objections not

meeting the specificity requirement set out above will not be considered by a District Judge.  A

party may not appeal a Magistrate Judge's report and recommendation directly to the United

States Court of Appeals for the Eleventh Circuit.  Appeals may be made only from a final

judgment entered by or at the direction of a District Judge.

**SO ORDERED** and **REPORTED AND RECOMMENDED**, this 26th day of April,

2019.

BENJAMIN W. CHEESBRO
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA