# In the United States District Court for the Southern District of Georgia Brunswick Division

UNITED STATES OF AMERICA

v.

STEPHEN KELLY, et al.,

Defendants.

CR 2:18-022

## ORDER

Before the Court are Defendants Stephen Michael Kelly, Mark Peter Colville, Clare Therese Grady, Martha Hennessy, Elizabeth McAlister, Patrick M. O'Neill, and Carmen Trotta's Motions to Dismiss. Dkt. Nos. 87, 102, 118, 122, 141, 158, 171. These Motions are largely identical, and each Motion moves to dismiss the respective indictment on four grounds. The Magistrate Judge issued a Report and Recommendation that recommended the denial of these Motions on all four grounds. Dkt. No. 411. Defendants have filed Objections to the Report and Recommendation. Dkt. Nos. 429, 432, 433, 437, 498, 499, 502. The Court held oral argument on August 7, 2019. Dkt. No. 480. After a careful, *de novo* review of the record, with respect to Defendants' Religious Freedom Restoration Act defenses the Court **OVERRULES** Defendants' Objections to the Report and Recommendation and **DENIES** Defendants' Motions to Dismiss. After a careful, *de novo* review of the record,

AO 72A
(Rev. 8/82)

with respect to Defendants' remaining argued grounds for dismissal—Selective or Vindictive Prosecution, Duplicitous or Multiplicitous Counts, and Failure to State an Offense—the Court **CONCURS** with the Magistrate Judge's Report and Recommendation and subject to the additional analysis set forth below **ADOPTS** the Magistrate Judge's Report and Recommendation **DENYING** Defendants' Motions.

## BACKGROUND

As the Magistrate Judge's Report and Recommendation summarizes the events that give rise to this action:

> Late on the night of April 4, 2018, seven Catholics—Defendants in this action—equipped with bolt-cutters, spray-paint, and a hammer made of melted-down guns, cut a padlock, opened a gate, and stepped onto the property of the Naval Submarine Base Kings Bay in Kingsland, Georgia. Once inside the main perimeter fence, three of the seven Defendants walked toward another enclosed area. When the three arrived, they cut through the secondary fence and concertina wire and entered the "Limited Area," a highly secured area where the Naval Security Force is prepared to use deadly force against intruders. The other four Defendants, while on the base, poured blood on the ground, hammered on the sides of a monument, hung banners and painted messages protesting nuclear weapons, and joined together in prayer. Base security personnel located and arrested all seven Defendants.
>
> Defendants are members of the Plowshares Movement, a Christian protest and activism group opposed to nuclear weaponry. Defendants include four grandparents, one Jesuit priest, and a descendant of Dorothy Day, a co-founder of the Catholic Worker movement who is currently under consideration by the Catholic Church for canonization as a saint. Doc. 313 at 23, 125, 145; Doc. 316 at 24-25, 124, 151. Defendants entered the base that night intending to perform, in their words,

2

> "nonviolent acts of prophetic witness against the governments possession of nuclear weapons . . . ." Doc. 245 at 5.

Dkt. No. 411 at 1-2.

Each Defendant has since been indicted and charged by the United States with the following offences, three felonies and one misdemeanor: (1) 18 U.S.C. § 1363, Destruction of Property on Naval Installation; (2) 18 U.S.C. § 1361, Depredation of Government Property; (3) 18 U.S.C. § 1382, Trespass; and (4) 18 U.S.C. § 371, Conspiracy. See Dkt. No. 1. Defendants have each moved to dismiss the respective indictment against them on the following grounds: (1) unlawful prosecution under the Religious Freedom Restoration Act of 1993 ("RFRA"); (2) selective and vindictive prosecution; (3) duplicitous and multiplicitous counts; and (4) failure to state an offense under international and domestic law.

## DISCUSSION

### I. The Religious Freedom Restoration Act of 1993

Defendants move to dismiss this case under the Religious Freedom Restoration Act of 1993. The impetus for Congress's passage of RFRA was the United States Supreme Court's decision in Employment Division v. Smith, 494 U.S. 872 (1990). In Smith,

> the Supreme Court held that the Constitution's Free Exercise Clause does not exempt religious persons from the dictates of neutral laws of general applicability. The devout must obey the law even if doing so violates every article of their faith. When Smith was handed down, some worried that it upset existing free exercise doctrine dating back to Sherbert v. Verner, 374 U.S. 398

3

(1963). In <u>Sherbert</u> and its progeny the Supreme Court had suggested that no law, not even a neutral law of general applicability, may "substantially burden" the exercise of religion unless that burden amounts to the "least restrictive means" of achieving a "compelling governmental interest." <u>Smith</u>, 494 U.S. at 883; <u>id.</u> at 899 (O'Connor, J., concurring in the judgment). What protections <u>Sherbert</u> appeared to afford religious observances, <u>Smith</u> appeared ready to abandon.

Concerned with just this possibility, worried that <u>Smith</u> left insufficient room in civil society for the free exercise of religion, Congress set about the business of "restoring" <u>Sherbert</u>, at least as a matter of statute. It opened its efforts with the Religious Freedom Restoration Act of 1993. See 42 U.S.C. § 2000bb(b)(1). Passed nearly unanimously, RFRA was (and remains) something of a "super-statute." Michael Stokes Paulsen, *A RFRA Runs Through It: Religious Freedom and the U.S. Code,* 56 Mont. L. Rev. 249, 253 (1995). It instructed that *all* forms of governmental action—state or federal—had to satisfy <u>Sherbert</u>'s test or risk nullification.

But as it turned out, this marked only the opening lines in what proved to be a long dialogue between Congress and the Court. In <u>City of Boerne v. Flores</u>, 521 U.S. 507 (1997), the Court held that RFRA stretched the federal hand too far into places reserved for the states and exceeded Congress's Section 5 enforcement authority under the Fourteenth Amendment. As a result, the Court held RFRA unconstitutional as applied to the states, though still fully operational as applied to the federal government. See <u>id.</u> at 529-36.

Undaunted, Congress reentered the field soon enough, this time with the Religious Land Use and Institutionalized Persons Act of 2000 [("RLUIPA")]. In RLUIPA Congress invoked not just its Fourteenth Amendment but also its Spending Clause powers to (re)impose <u>Sherbert</u>'s balancing test on state action. . . .

<u>Yellowbear v. Lampert</u>, 741 F.3d 48, 52-53 (10th Cir. 2014). The Supreme Court has since found that RLUIPA "imposes the same general test as RFRA," <u>Burwell v. Hobby Lobby Stores, Inc.</u>, 573 U.S. 682,

693 (2014); as a result, RLUIPA case law can be relevant to RFRA claims.

Turning to RFRA itself, it provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," 42 U.S.C. § 2000bb-1(a), unless the Government "demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," § 2000bb-1(b). Thus, the Act permits the federal government to "substantially burden a person's exercise of religion," § 2000bb-1(a), if the government can show "that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest," § 2000bb-1(b).

RFRA also provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."  § 2000bb-1(c). Accordingly, federal courts have applied RFRA as a defense to enforcement by the federal government for alleged violations of federal law; a defendant in such circumstances "may raise RFRA as a shield in the hopes of beating back the government's charge."

United States v. Stimler, 864 F.3d 253, 268 (3d Cir. 2017) (quoting United States v. Christie, 825 F.3d 1048, 1055 (9th Cir. 2016)). A defendant raising RFRA as a shield from application of the law must first show that the law at issue substantially burdened an exercise of religion. See Id. (citing Tagore v. United States, 735 F.3d 324, 330 (5th Cir. 2013)). If the defendant makes this showing, the burden shifts to the government to show a compelling government interest in applying the law at issue to the defendant and that such application to the defendant is the least restrictive means of furthering that interest. Id.

**A. Substantial Burden**

RFRA cannot be used as a defense to a criminal charge if the federal law at issue did not substantially burden the defendant's exercise of religion. Thus, a threshold inquiry is whether Defendants can show that the federal laws at issue[1] substantially burdened the exercise of their sincerely held religious beliefs. Notably, the beliefs and resulting actions that are at issue are those that give rise to this action. In other words, the beliefs at issue are those that Defendants testified led them to their actions at Kings Bay on April 4th and 5th, 2018, and the actions at issue are Defendants' actions at Kings Bay on that night.

---

[1] The federal laws at issue in this case are those that Defendants have been charged with violating: (1) 18 U.S.C. § 1363, Destruction of Property on Naval Installation; (2) 18 U.S.C. § 1361, Depredation of Government Property; (3) 18 U.S.C. § 1382, Trespass; and (4) 18 U.S.C. § 371, Conspiracy. See Dkt. No. 1.

Accordingly, in order for Defendants to make a *prima facie* case under RFRA, it is those actions that must be exercises of religion grounded in sincerely held religious beliefs and that also must have been substantially burdened by the application of the federal laws at issue.

RFRA applies to "any exercise of a sincerely held religious belief." Yellowbear, 741 F.3d at 54. The Act broadly defines "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). As the Supreme Court found in Hobby Lobby, "Congress mandated [in RFRA] that this concept [of exercise of religion] 'be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.'" 573 U.S. at 696 (quoting § 2000cc-3(g)). Further, the Court elaborated that the "'exercise of religion' involves 'not only belief and profession but the performance of (or abstention from) physical acts' that are 'engaged in for religious reasons.'" Id. (quoting Smith, 494 U.S. at 877). Finally, for RFRA to be applicable the religious beliefs must be "sincerely held." Holt v. Hobbs, 135 S. Ct. 853, 862 (2015).

With respect to whether a sincerely held religious belief or exercise thereof is substantially burdened by government action, "[a]t the very least, 'a "substantial burden" must place more than

an inconvenience on religious exercise.'" Wilkinson v. GEO Grp., Inc., 617 F. App'x 915, 918 (11th Cir. 2015) (quoting Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004)). The Eleventh Circuit has recognized that the United States Supreme Court's definition of "substantial burden" has "varied over time." Midrash, 366 F.3d at 1226 (citing Supreme Court decisions decided prior to the enactment of RFRA). In accordance with Supreme Court precedent, the Eleventh Circuit defines "substantial burden" as "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly," id. at 1227, "pressure that tends to force adherents to forego religious precepts," Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Human Servs., 818 F.3d 1122, 1144 (11th Cir. 2016) (quoting 366 F.3d at 1227), *or* pressure that puts the religious adherent "to the choice of violating their religious beliefs or facing a significant penalty," id. at 1148.

Turning to Defendants' beliefs and actions in this case, their actions on April 4-5, 2018, at Kings Bay Naval Base were "exercise[s] of religion" within the meaning of RFRA. As the Report and Recommendation states, "each Defendant believes that he or she was compelled by their religious beliefs, their primacy of conscience, and ultimately, by God, to demonstrate and take action in opposition to the presence of nuclear weapons at Kings Bay. The undersigned has no doubt that each Defendant actually and

8

genuinely holds these beliefs, and therefore, 'sincerely' holds these religious beliefs for the purpose of the RFRA analysis." Dkt. No. 411 at 49. Even though the act of trespassing is not a religious act in itself, when such an act is "engaged in for religious reasons," Hobby Lobby, 573 U.S. at 696 (quoting Smith, 494 U.S. at 877), then such an act is a religious exercise under RFRA. Because Defendants' actions at Kings Bay were exercises of their sincerely held religious beliefs that they should "take action in opposition to the presence of nuclear weapons at Kings Bay," dkt. no. 411 at 49, Defendants' actions at Kings Bay were engaged in for religious reasons and were thus "religious exercises" within the meaning of RFRA.

Having found that Defendants' actions at Kings Bay were religious exercises within the meaning of RFRA, the issue becomes whether the federal laws at issue substantially burdened said exercises of religion. Because the laws at issue put "significant pressure" on Defendants to not exercise their religion as they did at Kings Bay, Defendants were substantially burdened by the laws at issue. Going back to the night in question, Defendants were pressured by federal laws—which they are now being prosecuted for allegedly violating—to not undertake the actions that they undertook; in other words, the laws that are now being applied to Defendants pressured them to *substantially* modify their religious exercises on the night in question. Defendants were more than

9

"inconvenienced" by the laws they have been charged with violating: they are facing significant criminal charges and potential penalties. Thus, federal law placed "significant pressure" on Defendants because it attempted to "directly coerce[ ]" Defendants "to conform [their] behavior accordingly." Midrash, 366 F.3d at 1227. Accordingly, Defendants' religious exercises undertaken at Kings Bay were substantially burdened by the federal laws they are now being charged with violating.

Finally, it is not enough to say that Defendants could have asked for permission or that some Defendants have testified that they could have also exercised their religion outside of the perimeter fence (and not trespassed on the base). As the Report and Recommendation correctly states, "[t]he substantial burden analysis does not consider the availability (or lack thereof) of alternative religious practices." Dkt. No. 411 at 50 (citing Holt, 135 S. Ct. at 862 (finding that the "'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . ., not whether the [religious] claimant is able to engage in other forms of religious exercise")). Thus, the *prima facie* inquiry asks whether Defendants *on that night* were exercising their sincerely held religious beliefs and if so, whether *on that night* the laws in question substantially burdened those exercises. The Court does not, then, look at whether Defendants *could have* exercised their religion outside the perimeter fence on that night

10

or in the future, or whether they *could have* asked for authorization prior to their unauthorized entry onto Kings Bay and then exercised their religion if granted authorization.[2] Defendants are seeking exclusion from the enforcement of generally applicable laws for past actions; thus, it is those past actions that the Court must examine. Examining the actions in question, they were exercises of religion within the meaning of RFRA and applying federal law to Defendants for these exercises substantially burdened said exercises. Because Defendants have shown that the application of the laws at issue to their actions at Kings Bay on April 4-5, 2018, substantially burdened those religious exercises, Defendants have established a *prima facie* case under RFRA.

---

[2] Such questions go to whether Defendants were *required* by their religion to undertake the actions that they did. The government argues that a generally applicable law is *only* a substantial burden when it "prevents the individual from engaging in *religiously mandated activity*." Dkt. No. 227 at 4 (quoting Midrash, 366 F.3d at 1227) (emphasis added). Such an interpretation of "substantially burdened" would render part of the definition of "exercise of religion" obsolete. RFRA defines "exercise of religion" to include "*any* exercise of religion, *whether or not compelled by*, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7) (emphases added). If an exercise of religion is only substantially burdened when the exercise is required or mandated by the religion, then the Act's explicit inclusion in the definition of "exercise of religion" of actions that are "*not compelled by*" religion would be illogical because religious acts not compelled by religion would never be afforded protection under the Act. Such an interpretation of "substantially burden," then, does not square with the definition of "exercise of religion" and must fail. Thus, in order to make a *prima facie* case, Defendants need not show that their sincerely held religious beliefs *required* or *mandated* that they act as they did at Kings Bay.

11

**B. Compelling Government Interest and Least Restrictive Means**

Because Defendants have established a *prima facie* RFRA defense, the burden shifts to the government to show that the application of the laws at issue to Defendants furthers a compelling government interest and is the least restrictive means of furthering that compelling government interest. To succeed, the government must "demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 430-31 (2006) (quoting § 2000bb(b)(1)). In undertaking this inquiry, the Court "look[s] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[s] the asserted harm of granting specific exemptions to particular religious claimants." <u>Id.</u> at 431.

The government has established that it has compelling interests in the safety of those on Kings Bay Naval Submarine Base, the security of the government assets housed there, and the smooth operation of the base. With respect to the compelling government interests, Captain Brian Lepine, the Commanding Officer of Naval Submarine Base Kings Bay, swears that Kings Bay "is the U.S. Atlantic Fleet's homeport for Ohio-class ballistic missile nuclear submarines" and "is home to six ballistic missile submarines and

12

two guided-missile submarines" and "home to Strategic Weapons Facility, Atlantic," which "provides strategic missiles and strategic weapons system for assembling the Trident II D-5 submarine-launched ballistic missiles (SLBM) and processing missile guidance and launcher subsystem components." Dkt. No. 227-1 ¶ 3.  Captain Lepine further swears that the Ohio-class submarines and Trident II D-5 SLBMs "serve an integral part of our nation's strategic nuclear deterrent triad (air, land, sea)." Id. ¶ 4.  Further, this "leg" of the nuclear deterrent triad is the United States' "most survivable leg" in the event of an attack and thus "provide[s] the United States with assured second-strike capability." Id.  Such "second strike capability serves the compelling and existential interest in deterring a surprise nuclear attack on the United States of America, its territories, and our allies." Id.  Because a submarine loses its stealth attributes when it is not submerged, when "a submarine is in port," like at Kings Bay, it is "likely [at] its most vulnerable state." Dkt. No. 316 at 221.

The importance of these assets to the United States' national security and defense is highlighted by the fact that the security forces protecting Kings Bay "have authority to exercise the use of lethal force in executing their duties to protect the strategic assets that they are assigned to protect." Id. at 225.  Warnings about the authorization of deadly force against intruders are

13

posted at various locations, and a speaker system plays a reoccurring announcement approximately *every* eight to nine minutes: "Warning. This is a restricted area. Use of deadly force is authorized." Id. Because of this authorization to use deadly force, security forces respond to unauthorized intruders "armed with loaded weapons" and "are trained to use them." Id. at 226. Such a situation can lead to tragic consequences because "whenever you have individuals placed in a stressful environment where they don't necessarily fully understand their adversary or what they're up against, there is potential for things to go wrong." Id. at 226-27.

Even when security personnel responding to unauthorized intruders does not lead to lethal results at Kings Bay, such an incident "puts the entire security contingent on that installation on alert, which is disruptive to normal day-to-day operations associated with the operation of the base." Id. at 227. Such disruption "has the ability to impact operations that are directly in support of our nation's strategic deterrence programs, timelines, and policies and procedures." Id. at 227-28. Indeed, "[t]he United States Marine Corps Security Force Battalion has a very specific mission onboard Naval Submarine Base Kings Bay in that their assignment is specifically to support the critical facilities and infrastructure and the strategic assets assigned to SWFLANT and to the waterfront restricted area where the Ohio-class

14

fleet ballistic missile submarines would be moored if they were in port." Id. at 223.

For these reasons, the government has shown it has compelling interests in the safety of those on Kings Bay Naval Submarine Base, the security of the assets housed there, and the smooth operation of the base. The issue, then, becomes whether applying the laws at issues to Defendants for their actions at Kings Bay is the least restrictive means of furthering any one of these compelling government interests. The government has met its burden on this issue as well.

At this stage in the inquiry, "the question RFRA requires [the Court] to confront" is whether "the government [could] achieve its compelling interest to the same degree while exempting [Defendants] from complying in full with the [laws at issue]." United States v. Christie, 825 F.3d 1048, 1061 (9th Cir. 2016); see also Holt, 135 S. Ct. at 864 (holding that the government must "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]" (alterations in original) (quoting Hobby Lobby, 573 U.S. at 728)). The government has satisfied its burden of showing that the application of these laws to Defendants is the least restrictive means of furthering its compelling interests.

As an initial matter, as the Magistrate Judge correctly found, "the majority of Defendants' suggested alternatives (such as

15

forgoing prosecution, pre-trial diversion, or imposing only civil injunctions, fines, or ban and bar letters) reflect less *punitive*—but equally *restrictive*—government accommodations." Dkt. No. 411 at 64 (citing <u>Christie</u>, 825 F.3d at 1062). None of these options would have permitted Defendants to trespass on Kings Bay and destroy and depredate government property. The issue is whether Defendants should be excepted from the application of the laws at issue, and because these proffered alternatives would still apply the laws at issue to Defendants, they are not less restrictive means within the meaning of RFRA (just less punitive means). Defendants final proposed means, a permitted protest at Kings Bay, likewise fails because such a means would not have permitted Defendants to have engaged in the religious exercises that they engaged in—namely, trespassing onto Kings Bay and destroying and depredating government property. Defendants are not seeking an injunction to permit future actions but are seeking exclusion from the application of generally applicable laws for past actions; thus, it is those past actions—actions of trespass and depredation and destruction of government property—that the least restrictive means must accommodate.

Turning to the government's burden, it has shown that application of the laws at issue to Defendants for their actions at Kings Bay is the least restrictive means of furthering the government's compelling interests with respect to *each* Defendant.

First, Defendants' unauthorized access on Kings Bay could have easily led to deadly consequences and did in fact interrupt operations at the base (which could have interrupted military operations elsewhere that rely on the operations on the base). The government cannot achieve its compelling interests of ensuring the safety of the people on Kings Bay and the smooth operation of the base without applying 18 U.S.C. § 1382 to Defendants, which prohibits unlawful entry on naval bases. The only other alternative is to not apply § 1382 to Defendants, i.e., to exempt Defendants from its application, for their actions on that night but such an alternative does not permit the government to achieve its compelling interest to any degree—let alone to the same degree. Likewise, the government has shown that excepting Defendants from the application of §§ 1361, 1363—which forbid the destruction and depredation of government property—would not permit the government to achieve its interests to the same degree; destroying and depredating property interrupts base operations and could lead to deadly consequences by responding security forces. Because non-application of the laws at issue to Defendants for their actions at Kings Bay on April 4-5, 2018, would not have achieved the government's desired goals of ensuring the safety of those on the base, the security of the assets housed there, and the smooth operation of the base (and those operations elsewhere that rely on the smooth operations of the base), the government has met its

AO 72A
(Rev. 8/82)

burden of showing that the least restrictive means of furthering its compelling interests in these circumstances is the application of the laws at issue to Defendants for their actions on April 4-5, 2018 on Kings Bay.

For these reasons, the Government has satisfied its burden under RFRA of showing that is has a compelling interest in applying the laws at issue to Defendants for Defendants' actions at Kings Bay on April 4-5, 2018, and that applying the laws at issue to Defendants for those actions is the least restrictive means of further its compelling interests. Accordingly, Defendants' Objections to the Report and Recommendation are due to be **OVERRULED**. Defendants' Motions to Dismiss with respect to their RFRA claim are due to be **DENIED**.

**II. Selective or Vindictive Prosecution, Duplicitous or Multiplicitous Counts, and Failure to State an Offense**

With respect to the remaining grounds for dismissal that Defendants put forth, after a careful *de novo* review of the record in this case, the Court **CONCURS** with the Magistrate Judge's Report and Recommendation, to which objections have been filed. Accordingly, the Report and Recommendation of the Magistrate Judge is due to be **ADOPTED** as the opinion of the Court.

## CONCLUSION

For the reasons provided above, Defendants' Motions to Dismiss with respect to their RFRA defense are **DENIED**. With respect to Defendants' remaining argued grounds for dismissal—Selective or Vindictive Prosecution, Duplicitous or Multiplicitous Counts, and Failure to State an Offense—the Court **CONCURS** with the Magistrate Judge's Report and Recommendation and **ADOPTS** the Magistrate Judge's Report and Recommendation **DENYING** Defendants' Motions. Thus, Defendants' Motion to Dismiss, dkt. nos. 87, 102, 118, 122, 141, 158, 171, are **DENIED**. All Objections to the Report and Recommendation are **OVERRULED**.

**SO ORDERED**, this 26th day of August, 2019.

_/s/ Lisa Godbey Wood_
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA